I,CARAWAY, J.
The mother of six children contests the trial court’s adjudication of the children as children in need of care. She also contests the permanent placement goals of adoption and guardianship for the children. Finding that the trial court’s rulings were in the best interests of the children and in accordance with legal standards of the Children’s Code, we affirm the trial court’s rulings.

Facts and Procedural History

D.D.B. is the mother of seven children between the ages of twelve and eight months, six of whom are the subject of these proceedings.[1] The four older children were first placed in protective custody in September, 1995, after Christopher C. physically abused the then youngest child, C.C. Christopher C. was the father of C.C., and as a result of the abuse, the seven-week old infant was placed in pediatric intensive care with a fractured skull. As a result of this beating, Christopher C. and D.D.B. were both arrested. The children were placed in foster care by the Office of Community Services (“State”). D.D.B. was homeless at this time. Ultimately, Christopher C. was convicted of *1115 attempted murder and is presently incarcerated.
After the children were returned to D.D.B.’s custody on December 13, 1995, the State began offering various social services. The State provided day care so D.D.B. could work, helped D.D.B. obtain employment 1 ¡.and locate housing, paid her rent, paid the electricity bill, and occasionally bought groceries and supplies for the family.
In June, 1996, the State’s letter to the court noted that the situation had deteriorated despite its efforts to stabilize D.D.B.’s family. D.D.B. was evicted from her apartment and the utilities disconnected. She moved into the YWCA Women’s Shelter in May, 1996. In June, D.D.B.’s aunt, who resided in California, offered to help D.D.B. make a fresh start if she moved her family to California. The State recommended this plan and obtained court approval for D.D.B. to move to California on June 6, 1996. Nevertheless, the move to California never occurred.
During mid 1998, the State made approximately 25 visits to D.D.B.’s home. D.D.B.’s fifth child was born on February 27, 1998. During May, D.D.B. and T.B., the father of the fifth child, were both unemployed and living with all five children in a motel room, where all of the children except the infant slept on the floor. They relocated to an apartment in June. The apartment had no beds and the plumbing did not work properly. D.D.B. and T.B. had difficulty keeping the electricity on. Accordingly, in December, 1998, the State removed the five children, and placed them in foster care, to protect them from “further neglect.” D.D.B. stipulated to the allegations of the State’s petition and the children were adjudicated as children in need of care on May 27, 1999, on the grounds of lack of supervision and inadequate shelter.
During the second State intervention, the two older children, S.D. and D.D., were briefly placed with their biological father, Simon Profit. After |3Profit advised the State that he could no longer care for them, the State requested and obtained trial placement of the two older children with D.D.B. in August, 1999. Two weeks after the trial placement, D.D.B. was arrested after she left these two children unsupervised, along with several other, younger children who belonged to 'others. This episode resulted in the two older children being placed back in foster care in September, 1999. However, in December, 1999, the court, transferred custody of all five children back to D.D.B., and ordered that the State monitor her home. A hearing was held on January 14, 2000, during which the State released custody of the children. Thereafter, on January 27, 2000, the State was released from monitoring D.D.B.’s home.
The State’s third intervention in this family, and the circumstances that give rise to the instant proceedings, occurred on October 26, 2000, when D.D.B. was arrested for the second time after leaving her children alone at home, unsupervised, for more than, three hours.' By this time, D.D.B. had given birth to a sixth child. An instanter order of custody, placing the children in the legal custody of the State, was signed on October 30, 2000. The continued custody hearing was continued twice, with D.D.B. appearing at each hearing to request through counsel that the children be returned to her custody. On December 15, 2000, the court ordered trial placement of the children with D.D.B., provided that the State “closely | ¿monitor” and supervise the placement.[2] However, *1116 this judgment was rescinded by order dated March 7, 2001.
During the interval between the State’s preliminary assertion of custody in late October, 2000, and the December 15th dis-positional judgment, the State requested that the trial court approve its initial case plans. The report noted that “custody was continued with our Agency pending the Adjudication Hearing which has not yet been scheduled.” The State attached a motion and order to approve the six case plans submitted to the trial court. The case plan goal identified for each individual child’s plan was “reunification with parent or principal caretaker.” Accordingly, the trial court approved the case plans in glo-bo by order dated December 12, 2000. On December 15, 2000, the court ordered trial placement of all of the children with D.D.B. but continued legal custody of the children with the State.
Thereafter, on March 6, 2001, the State again wrote the trial court to update it on the children’s status during their trial placement with D.D.B. The State requested that the December order authorizing placement with the mother be rescinded, and recommended that the children be placed back in foster care to ensure their safety, “at least until D.D.B. can prove that she can provide adequately for her children and begins to show some type of positive improvements.” In its letter, the State alleged that D.D.B. and her new boyfriend both physically abused C.C. and that D.D.B. called the State | Band requested that the children be “picked up.” The December order was rescinded and the six children again placed in foster care on March 7, 2001, on the ground of lack of supervision.
Summing up the situation, the State advised the trial court as follows:
We are writing this report to inform you of the current situation involving this family. As you will recall Ms. B.’s six children entered foster care on 10/26/00, due to Lack of Supervision. This was the third foster care placement for S.D., D.D., L.D. and C.C. and the second placement for M.B. In court on 12/15/00 you ordered the children returned to the mother’s care on a trial basis, with the Agency maintaining custody. The children were moved home by the Agency the same evening.
At the time of the children’s return home Ms. B. was advised by the case manager that she was to provide adequately for the children’s needs, to make sure they were properly supervised at all times and of the fact that they are still in foster care and therefore cannot be spanked. Although Ms. B. had just stated earlier in the day in court that she wanted her children returned home and could provide for them, once they got there she appeared depressed and overwhelmed; and did not show any expressions of joy to have her children home. Since the children’s return to the home the Agency has provided numerous services to this family; including providing food on a couple of occasions, transportation for Ms. B. to appointments and to pay bills and transportation for the children to medical appointments. The case manager even attends these appointments with the children. The Agency has linked Ms. B. with several community resources attempting to obtain services for Ms. B. The Agency provided donated Christmas presents to the children at Christmas. The Agency *1117 purchased a used washing machine for her so the children would have clean clothes.[3] The Agency obtained funds from the Jr. Charity League on Ms. B.’s behalf and purchased a table and five large storage binds (sic) to be used to place the children’s clothes in. Currently the Agency is paying for day care services for Ms. B.’s six children so that she can work. Several of the former foster parents have also assisted Ms. B. by giving her some dining room chairs, a television, a baby bed, one large storage bind (sic) and they even bought Christmas presents for the children.
[[Image here]]
Sometime in January, 2001, Ms. B. allowed her new boyfriend to move into the home. He admitted that he had just been released from prison in Sept. 2000. He stated he had been in trouble on and off all of his life and all together had served about eight and a half years in prison. The case manager explained that the children were still in foster care and could not be whipped, abused or neglected in anyway....
[[Image here]]
... In earlier (sic) January it was reported to the Agency that C.C., Ms. B.’s 5 year old, limited son returned to school from the Christmas holidays with a large scar over his eye. When questioned about this C.C. stated he fell on the walk with a fire truck. Ms. B. stated he was playing with a fire truck he got for Christmas and fell face first on the walkway and scarred his face. On January 16, 2001, it was reported to the Agency that C.C. had a circular bruise on the top of each foot and his feet were swollen so badly until he could barely .walk. C.C. could not say what happened to his feet and Ms. B. had no idea either....
[[Image here]]
On 2/27/01 the Agency received a report regarding a cut over C.C.’s left eye. This report is being investigated by Mrs. Cassandra Brown. In talking with the children, C.C., S.D. and L.D. all stated their mother threw a shoe and hit C.C. in the eye. D.D. stated C.C. cut his eye in the bathroom. Ms. B. stated the children were fighting and throwing shoes at each other and this is how he got cut. She stated she whipped them for their actions. C.C. was treated at North Room Hospital for this cut. On 2/28/01 the case manager learned that S.D. and L.D. were whipped by their mother for telling Ms. Cassandra Brown that their mother threw a shoe and hit C.C. D.D. was not whipped because he did not tell the truth. L.D. stated to the case manager that his mother told them to say they were playing and throwing shoes and that’s how Chris’ eye got cut, but he stated, “I’m going to tell the truth, Momma did it.” When Ms. B. was confronted by the case manager about whipping the children, as they are still in foster care and she is aware that they cannot be whipped she responded, “I have six children and I am going to whip them, they are not going to end up whipping me.” The investigation is still pending, but according [to the case manager] physical abuse of C.C. will be validated.
|70n 3/6/01 Ms. B. phoned the case manager and stated she wanted the Agency to come pick up her children....
*1118 However, the March 7, 2001 removal of the children proved to be fleeting. On March 30, 2001, the trial court returned custody of C.C. to D.D.B.,[4] placed the five other children with her on a trial basis, while retaining their legal custody in the State, and scheduled a ninety day review hearing for late June.
On April 25, 2001, the State wrote the trial court attaching copies of proposed case plans in connection with an administrative family team conference scheduled for the next day. The letter stated that “[a]fter the plan is finalized and signed at the Team Conference, we will submit it to you for your approval or your recommendations for any needed changes.” The overall assessment portion of the plan noted that D.D.B. “has not made any significant progress since her children entered foster care on 10/26/00.” In closing, the report noted that “[t]he goal for this family continues to be Reunification at this time, pending D.D.B.’s compliance with her case plan.” The family case plan permanency goal was recited as “Reunify with Par-entis) or Principal Caretaker(s).” Each child’s permanent case plan goal was designated as “Reunify with Parent or Principal Caretaker.” The trial court signed off on the second order approving the case plans on May 16, 2001.
The case review hearing occurred on June 25, 2001. C.C.’s legal custody was once again removed from D.D.B. and placed with the State andj^legal custody of the other five children continued with the State. The judgment noted that all six children had been left home alone on May 7, 2001, and June 20, 2001, that the family home had no. utilities legally connected, and that an eviction order removing D.D.B. and the children from their home had been entered on June 25, 2001. On May 7, 2001, a foster parent had stopped by the home and found the children unattended. The children were removed based on lack of supervision and inadequate shelter. The judgment noted that:
During the Agency’s interventions with the family, every available resource/service was utilized to prevent removal and/or assist with return of the children to the family home, to include the following: Intensive Home Based Services (1 time), Family Services (3 times), Foster care services (3 times), referrals to the following which included transportation for D.D.B. and her children as well as personally attending the interviews, participating in the interviews and assisting with follow-up responsibilities to secure the services: Ouachita Multi Purpose Community Action Program, Salvation Army, United Way, Twin City Welfare, Monroe Housing Authority, Office of Family Support, First Call for Help, Family Matters Family Resource Center, and Family Care Services. [D.D.B.] and her family have been provided the maximum in funding from the Agency’s preservation and reunification resources. She has been referred to and provided parenting skills training, psychological counseling, day care services, and in-home counseling during each of the three foster care experiences. 26 personal contacts have been made with her during the period of time from 3/30/01 to 6/21/01. 23 calls and letters have been done on her behalf to community resources during April and May 2001. [D.D.B.J’s children have been provided three separate sets of wardrobes to total *1119 $900 each during the period of time they have been in the State’s custody since 10/00, for a total of $5400 as [D.D.B.] refused to return the clothing for each child after they had been back in her home....
After the court terminated the children’s final trial placement in D.D.B.’s home in June 2001, the State conducted home studies for each child’s placement alternatives. The oldest two children, S.D. and D.D., 13were placed in the home of their paternal uncle and his wife, Mr. and Mrs. Profit. L.D. was placed in the home of his paternal grandmother, Mrs. Phillips. M.B. was placed in the home of her godmother, Ms. Johnson.
The State submitted a written report in preparation for its administrative review family team conference hearing scheduled for October 11, 2001, and attached revised case plans for each child, requesting court approval thereof. The report concluded that D.D.B. had failed to comply with her case plan, had failed to complete a G.E.D., and had failed to comply with the Find Work program. Yet, the permanent case plan goal for each child stated “reunification.” However, the assessment portion concluded that progress had been made in that the children were in placements with caretakers who would be willing to have them permanently. Pursuant to the State’s written request, the trial court approved the updated case plans on October 23, 2001.
On October 26, 2001, the State filed a motion for a permanency hearing, wherein it alleged that the children had been in foster care since October 26, 2000, and “is in need of a permanent plan or review of a permanent plan.” A permanency hearing scheduled for November 6, 2001, was continued until November 26, 2001.
The court minute entry described the November 26, 2001 hearing as a “full hearing and permanency hearing.” The caseworker testified that the State’s permanency recommendation consisted of asking the court to terminate D.D.B.’s parental rights for failure to comply with the case plan. Although the court indicated at the close of the hearing that its written |inreasons for judgment would issue from the bench on November 29, 2001, this did not occur. On November 28, 2001, D.D.B. gave birth to her seventh child.
Thereafter, the State wrote the trial court on December 11, 2001, to bring it up to date on the family’s current situation. The State advised in closing that the children would never have a chance for a safe, stable and healthy life if they were placed back in their mother’s home, but they would have such a chance if they remained in their current foster placements.
The record reflects that the next review hearing on the case occurred in chambers on January 23, 2002, when the trial court, in reasons orally assigned, adjudicated all six children as in need of care. This ruling was memorialized by judgment signed on February 27, 2002.[5] Likewise, the unresolved permanency hearing was also addressed in chambers on January 23, 2002. The trial court, in reasons orally assigned, found that all six children continued to be *1120 children in need of care, that the children had been in State custody for fifteen months, and that it was in the best interests of these children that their custody continue in the State, with the following permanent case plan goals:
S.D. Guardianship to relative
D.D. Guardianship to relative
L.D. Guardianship to relative
C.C. Adoption
_LqM.B. Adoption
S.B. Adoption
The permanency hearing judgment was signed on February 24, 2002.
As a result of the review hearing held on January 23, 2002, the trial court relieved the State from custody of L.D., age eight, and granted guardianship to his paternal grandmother. The judgment granting guardianship was dated February 24, 2002. At the same hearing, the trial court granted guardianship of S.D., age eleven, and D.D., age ten, to their paternal uncle and aunt. This judgment was also dated February 24, 2002. D.D.B. appeals from the trial court’s judgments adjudicating the six children as children in need of care, arguing that the State failed to prove the grounds supporting the adjudication, and that the trial court erred by not maintaining reunification as the State’s case plan goal for her family.

Discussion

Child in Need of Care

A child in need of care proceeding shall be commenced by petition filed by the District Attorney. La. Ch. C. art. 631. The petition shall set forth facts which show that the child is a child in need of care, including the acts or omissions of either parent which caused or contributed to the child’s condition. La. Ch. C. art. 634. Once a petition is filed alleging that the child is in need of care, the State bears the burden of proving the allegations of the petition by a preponderance of evidence. La. Ch. C. art. 665. State in the Interest of A.R., 99-0813 (La.App. 1st Cir.9/24/99), 754 So.2d 1073.
La. Ch. C. art. 606 enumerates the grounds upon which a child is found to be in need of care. Art. 606 provides in pertinent part as follows:
I is A. Allegations that a child is in need of care must assert one or more of the following grounds:
[[Image here]]
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
In this case, the State obtained custody of the children pursuant to an instanter order of custody issued in accordance with La. Ch. C. art. 619(C). The affidavit in support of the instanter order alleged that the Office of Community Services received a report of alleged “lack of supervision” when D.D.B. left the oldest child, age ten, in charge of the other children and left home at about 8:00 a,m. on October 26, 2000. A caseworker happened by the house and discovered the children there, unsupervised, approximately 3/é hours later. The alleged incident resulted in D.D.B.’s arrest for six counts of child neglect. Based upon the affidavit and presumably due to the mother’s arrest, the trial court found reasonable grounds to believe that the children were in need of care and placed them in the temporary custody of the State. Shortly thereafter, a continued custody hearing was conducted pursuant to La. Ch. C. art. 624. D.D.B. appeared through counsel and requested *1121 that the children be returned to her. The order signed November 2, 2000, indicates that the trial court continued custody of the children in the State, and found that “continuation in the family home is contrary to the best interests of the children.” Thereafter, the petition requesting that the children be adjudicated as children in need of care was filed on November 20, 2000.
|13The petition alleged that D.D.B. “perpetrated an act of lack of supervision for the six minor children by leaving the children at home alone,” and that “this is not the first report of D.D.B. leaving the children at home unattended.” The State’s allegations concluded that “[d]ue to the seriousness of leaving six very young children unattended to provide for themselves, there is good cause to believe that D.D.B. cannot adequately provide for the health, safety, and welfare of her minor children.”
When the adjudication was finally tried almost twelve months later, the State foster care worker testified that D.D.B. had a long history with the agency. The State ease manager testified that when she visited D.D.B.’s home on a routine scheduled visit during the afternoon of June 20, 2001, she also found the children there alone, and waited with them until D.D.B. returned about forty-five minutes later. When D.D.B. testified at the hearing, she first admitted leaving the children alone in June, but then denied that she ever left them unattended, as if leaving them alone and leaving them unattended were not in fact the same thing.
D.D.B. argues that the State failed to carry its burden of proving the allegations of the petition, and failed to show that the children were exposed to any risk of harm as a result of her absence. D.D.B.’s counsel relies on State in the Interest of A.R., supra, arguing that La. Ch. C. art. 606(A)(3) requires proof of either a parent’s prolonged absence or an absence which places the children at substantial risk of imminent harm to support adjudication, and that the State did not carry its burden of proving these grounds. Nevertheless, the court found in State in the Interest of A.R., supra, that although the evidence failed to show adequate grounds for adjudication under Ch. C. art. 606A(3), there was ample evidence in the record to support adjudication based on appellant’s “repeated pattern” of neglecting her child and placing the child at risk.
It is well settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. State in the Interest of S.M.W., 2000-3277 (La.2/21/2001), 781 So.2d 1223. In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify. Id.
We have reviewed the record in this case and find that it clearly establishes that D.D.B. left her children unsupervised on numerous occasions documented by the State, both before and after the State intervened and began supervising her home and her children’s welfare. Like State in the Interest of A.R., supra, the record reveals that D.D.B.’s pattern of conduct evinces an overall disregard for her children’s safety and well-being. Based on our review of the record, we find no error in the trial court’s adjudication of these children as children in need of care. Therefore, this assignment of error is without merit.

Compliance with Case Plan.

The trial court’s permanency hearing judgment dated February 24, 2002, found *1122 that based upon the best interests of the children, the permanent plan goals for S.D., D.D. and L.D. was guardianship with relatives, and that |1Bthe permanent plan goals for C.C., M.B. and S.B. was adoption. Appellant argues that D.D.B. adequately complied with the case plan to the extent that reunification should continue as the case plan goal.
The caseworker testified at the November 26, 2001, hearing that although D.D.B. had attended parenting classes, her compliance with the case plan was minimal. The State recommended termination of D.D.B.’s parental rights as the case plan goal because of her noncompliance. The caseworker testified several times that the main issue over the years was D.D.B.’s leaving her children alone, or a lack of supervision. The caseworker testified that the agency notified D.D.B. at the last family team conference before the hearing that the State would pursue termination of her parental rights, and it had only been since then that D.D.B. attempted compliance with the case plans.
La. Ch. C. art. 702 provides in pertinent part as follows:
[[Image here]]
B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal....
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
|1B(2) Adoption.
(3) Placement with a legal guardian.
[[Image here]]
To reverse a trial court’s permanency plan determination, an appellate court must find from the record that the trial court’s finding is clearly wrong or manifestly erroneous. State in the Interest of J.B., 35,486 (La.App.2d Cir.2/27/2002), 811 So.2d 179.
In State in the Interest of L.L.Z., 620 So.2d 1309 (La.1993), the Supreme Court summarized those situations in which little or no expectation of reformation of a parent’s conduct exists, as follows:
The jurisprudence indicates to us that there is no expectation of reformation and no likelihood of reformation when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. Furthermore, conduct such as mental or behavioral disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. However, a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.
The jurisprudence has applied this test for reformation to determine if a permanency placement plan of reunification is consistent with the best interest and special *1123 needs of a child. See State in the Interest of S.R., 2000-1927 (La.App. 4th Cir.4/11/01), 788 So.2d 503. Reformation means more than cooperation with agency-authorities and is shown by a significant, substantial indication of reformation such as altering or modifying in a significant way the behavior which served as a basis for the State’s removal of the child from the home. Id.
The record demonstrates that D.D.B. failed to make significant measurable progress toward correcting the conditions which led to the children being removed from the home. Although D.D.B. was repeatedly successful in obtaining the return of her children in trial placements, such placements occurred in housing which the agency helped D.D.B. obtain. Nevertheless, within a few months thereafter, conditions in D.D.B.’s existing housing became so deplorable that the children were once again removed. The record shows that agency and contract case workers provided intensive home services for D.D.B. during the course of a five year period. The worker and the foster parents furnished food, clothing, furniture, gifts for the children, money for utility bills, child care services, transportation, and medical care, all in an attempt to alleviate D.D.B.’s dependency needs and provide her with an opportunity to obtain employment and keep her family intact. Yet there is no evidence in the record with which to support a finding that D.D.B. modified her pattern of behavior which has long served as the basis for the children’s removal. As noted in the record, the children have been in foster care for more than half of their lives.
Moreover, the record discloses that during the State’s third intervention in the family, it case-reviewed the proceedings three times between the time the children entered care in late October, 2000, and the November, 2001, trial. Even though the case plans are not filed into evidence as exhibits, copies of the State’s letters to the court updating the status of the case, the administrative review/family team conference reports and the case plans themselves appear in the record as being filed along with |1Rthe motion and orders requesting court approval. These reports disclose that each time the case was staffed, the social worker and case manager met with D.D.B., the foster parents, and the children and reviewed D.D.B.’s case plan goals of improving her parenting skills, maintaining adequate housing and utilities, and obtaining psychological counseling, a G.E.D., and stable employment. The reports indicate as a whole that D.D.B. failed to make any significant progress, and was hostile and uncooperative with the agency. As a result of this failure, when the agency staffed the case in October, 2001, it began considering alternative placement goals of adoption and guardianship and notified D.D.B. accordingly.
Thus, under the circumstances and based on our review of the record, we find no manifest error in the trial court’s finding for the permanent placement goals of adoption and guardianship, rather than reunification. The ruling is clearly in the best interests of the children. This assignment of error is likewise without merit.
Costs of appeal are assessed to appellant.
AFFIRMED.

. The youngest child is an infant who was born around the time of the hearing which gave rise to the judgments being appealed.

. We note that this December 15, 2000, judgment was premature in that it was rendered *1116 prior to the children being adjudicated as children in need of care pursuant to La. Ch.C. arts. 659, et seq.

. The caseworker testified at trial the D.D.B. sold the used washing machine to a third party.

. C.C. is disabled due to the neurological injuries he received as a result of physical abuse by his father and purportedly receives $531 per month in benefits from the Social Security Administration. The trial court placed C.C. back in D.D.B.'s custody, presumably in an attempt to reinstate payment of those benefits to her.

. On February 20, 2002, the State filed a petition to terminate parental rights for the three youngest children: C.C., M.B. and S.B. At this time, these three children were all in the same foster home. The petition alleged that D.D.B.'s overall actions indicated a lack of compliance with the case plan and a lack of reasonable expectation of reformation. The State alleged that it had assumed parenting responsibilities for at least two extended periods of time, consisting of approximately half of these children's lives, and that it was in the best interests of these three children to be freed for adoption. A full hearing on the petition to terminate was set for May 8, 2002.