MOORE, J.
CP, a minor child adjudicated in need of care, appeals judgments that denied a motion by the State of Louisiana Department of Children and Family Services (“DCFS”) to change CP’s case plan from reunification with the mother, AP, to adoption, and awarded AP weekly, supervised overnight visits with CP. For the reasons expressed, we affirm.

Factual Background

CP was born on July 12, 2014. His mother, 32-year-old AP, and father, CH, were not married. CP and AP officially resided with AP’s mother, Rhonda, and Rhonda’s boyfriend, Roger, in Stonewall, but actually stayed there only a few nights a week. Because AP did not have reliable transportation, and needed to get to her job in Shreveport, she usually stayed with friends in town, leaving CP in their care while she was at work.
On the morning of March 23, 2015, AP picked up CP from one such friend’s house, brought him back to Stonewall, started to change his diaper and, according to AP, suddenly discovered the child had been whipped or beaten on his back. Although the skin was not broken, virtually every square inch of the baby’s back was red or purple with circular and linear bruises; there were also smaller injuries to his arm and nose. AP rushed him to Willis-Knighton South. Questioned by police, AP insisted that she did not inflict the bruises, and had no idea how they occurred; the child, she said, was fine when she dropped him off the night before. Officers questioned all the women with whom AP had left the child that weekend, but all denied hurting him and insisted he was fine when they saw him last. No charges were brought against any of CP’s babysitters.
DCFS filed an affidavit in support of an instanter order on March 24; CP has been in state custody ever since. AP was arrested for cruelty to juveniles on April 29 and taken to jail that day. On May 21, at an evidentiary hearing, AP stipulated that CP was in need of care, without admitting the allegations. On June 26, at a dispositional hearing, the juvenile court found CP continued to be in need of care and the goal was reunification with AP. The minutes recite that the case plan goal of reunification was “granted.”
In the criminal matter, AP never admitted that she injured the child or disclosed which of her friends might have done it. On August 31, she pled nolo contendere and received seven months. Although AP was in jail, the juvenile court held a case review hearing on September 17, finding that CP was still in need of care and that the goal was still reunification. The court also set the matter for a “Permanen *603 cy/Case Review Hearing” on March 3, 2016.
In February 2016, DCFS notified the court that it was changing the goal from reunification to adoption. Although it conceded that AP had no prior offenses other than the incident with CP, and that she tested negative for controlled dangerous substances, DCFS alleged that AP had attended only six of 16 anger management classes with Williams Counseling Services. The matter proceeded to a hearing that took place over three days, March 3, March 17 and May 16, 2016, before a different judge of the juvenile court.

Evidence at the Permanency Hearing

At the March 3 hearing, Veronica Williams, a foster care worker for DCFS, testified that the agency changed its goal from reunification to adoption because of the severity of the child’s injuries and because AP was “in denial” about what happened. The court asked Ms. Williams why, knowing the extent of the injuries since March 2015 and knowing of AP’s nolo plea since April, DCFS had consented to reunification in July, but suddenly changed its goal to adoption in February 2016? Ms. Williams conceded she was not “on the ease” in its early phases and could not really explain the sudden change in goal.
AP testified that she had been sexually abused by her maternal grandfather when she was four, and had received counseling for it. She still could not explain what happened to CP on March 23; she pled nolo not' because she was guilty, but to get out of jail sooner. She admitted missing a lot of counseling sessions, but only because she was in jail at the time; since her release, she had attended regularly and found the sessions helpful. She also said she got a job at Goodwill in Shreveport, and still needed to stay with friends in town because of transportation issues, but she would no longer leave CP with the same friends as before.
At the March 17 hearing, AP’s mother, Rhonda, and Rhonda’s boyfriend, Roger, testified that they had never seen AP harm the child or even display any violent tendencies, but she had made “poor choices.” They were willing to keep and babysit CP while AP was working. Roger gruffly denied that he was unwilling to keep the child on account of its race (AP is white and CH is black). AP reiterated that she did nothing to harm her child. CP’s foster parents, Mr. and Mrs. Eppers, were present in court and conferred with the judge but did not speak on the record.
At the May 16 hearing, AP provided, in great detail, a minute account of everything she did in the two days before she discovered CP’s injuries, consistently denying that she had whipped the child. She admitted she had grown frustrated with the process, was at the end of her rope, and was perhaps not always cordial with DCFS workers. She introduced certificates of completion showing that she successfully completed the 16-week programs in anger management and “active parenting today” with. Williams Counseling Services. DCFS did not call the counselor, Anthony Williams, to testify, but offered a letter from him stating that she completed all classes and voicing “some doubt that she is capable of providing a safe and nurturing environment for her child.” The letter also cited the extent of the injuries, the “denial of responsibility” and a possible diagnosis of PTSD “which may have a detrimental impact on her parenting skills.”
At the close of the hearing, the court orally ruled that the goal would remain reunification. The court also ordered overnight weekend visits from 6 pm Friday to 3 pm Sunday. DCFS and counsel for CP sought writs; the court, suspended the overnight visits until June 3 “to provide addi *604 tional transition time.” A panel of this court granted the writ on July 7 and ordered the juvenile court to forward the record within three days.

Motion to Modify and Terminate Overnight Visits

Meanwhile, on June 22 counsel for CP filed an emergency motion to modify the disposition and terminate overnight visits. This alleged that PC suffers from reactive airway disease, and on the two overnight visits that had occurred thus far, people were smoking in the child’s presence and ashtrays full of cigarette butts were present throughout the house. It also alleged that on the second visit, a Court Appointed Special Advocates (“CASA”) volunteer came to do a welfare check, knocked on Roger’s front door, and nobody answered.
The court held a hearing on the emergency motion on June 28. Henry Sandifer, the CASA volunteer, testified that when he came to Roger and Rhonda’s house on June 18, he knocked on the door and got no answer. He added, however, that after he left, got in his vehicle and made a phone call to his supervisor, he came back, met with the family and performed his welfare check. He said there was a strong and offensive reek of cigarette smoke wafting from the house, but he saw nobody smoking in CP’s presence; later, he testified he never actually entered the house. Susan Smith, the CASA supervisor, testified that she paid the welfare visit on June 3, and was “shocked” to see filled ashtrays in the house, but admitted she saw nobody actually smoking around CP.
Rhonda and Roger testified they did not smoke in CP’s presence, but admitted that they were smokers, they had ashtrays in their house, they intended to smoke when the child was not there, and CP may be exposed to the smell from the furniture, carpets and drapes. Both said they were willing to comply with whatever the court orders. AP testified that she did not smoke around CP, was trying to quit smoking, and knew it was bad for CP, but the child had never had an asthma attack in her presence.
Under cross-examination by CP’s, attorney, AP admitted she had been fired from her job at Goodwill; the employee corrective action notice listed her use of “profane, discourteous, abusive, intimidating or rude language or action against another employee, consumer or others.”[1] Also, AP gave a meticulous account of the custody exchanges before and after each visit.
Sylveria Hunt, DCFS’s foster care case manager, gave her version of the custody exchanges. She felt that AP spent a lot of time “chasing” CP around, and that the child did not interact well with his grandmother, Rhonda, on June 3.
Finally, Stacy Eppers, the foster mother (and prospective adoptive parent) testified that since she had custody of CP, in March 2015, she had taken him to the doctor 74 times, for reactive airway disease, seizure disorder, and speech and physical delays. She voiced these concerns to AP, telling her she needed to quit smoking and quit washing the child’s clothes in scented detergent. She added that CP stayed “angry” for days after a visit with AP, and that on one occasion, she heard AP say she had to call one of the friends who was suspected of beating CP in the first place.
At the close of the hearing, the court orally ruled granting every-weekend visits, “generally” supervised by Rhonda or Rog *605 er, with no smoking in the house while CP was there. The court also ordered DCFS to provide PTSD therapy for AP, and' advised AP to show some self-control and quit undermining her employment. The court set the next review for September 22.
In conjunction with the pending writ application, this court ordered the juvenile court to provide written reasons for judgment. The court filed- a comprehensive, 9 ⅜-page opinion with findings of fact and reasons for judgment. The court concluded (1) AP was in compliance with her case plan and has made significant, measurable progress, under La. Ch. C. art. 702 C(l); (2) DCFS failed to make reasonable efforts to reunify the family or to finalize another plan, under La. Ch. C. art. 702 -E, especially when it changed its goal from reunification to adoption before AP could complete the plan; and (3) the plan of adoption is not the most appropriate and.in the best interest of CP, under La. Ch. C. art. 702 C. In support of CP’s best interest, the court cited the success of the visits, AP’s clean criminal record, and the fact that the counselor, Mr. Williams, never once recommended taking the child away from AP. The court specifically rejected the permanent plan of adoption.
The court rendered a permanency/case review judgment that incorporated these findings and conclusions. Counsel for CP assigned this ruling as error, in the pending writ application, which this court converted to an appeal on August 1, 2016.

Applicable Law

If, at any point in child in need of care proceedings, the child is removed from his parents’ care and control and placed in the custody of DCFS, the provisions of the chapter of the Children’s Code entitled “Dispositional Reviews” govern the review process until the child achieves permanent placement. La. Ch. C. art. 701. Under this chapter, the court must conduct a permanency hearing to consider in-state and out-of-state permanent options for the child. La. Ch. C. art. 702 A. In the permanency hearing, the court must determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement, stated in Art. 702 C:
(1) Return the child to the legal custody of the parents .within a specified period consistent with the child’s age and need for a safe and, permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case , plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
(3) Placement with a legal guardian.
(4) Placement in the legal custody of a relative* * *.
The court must also determine whether DCFS has made reasonable efforts to reunify the parent and child. The child’s health and safety are the paramount concern in the court’s determination of a permanent plan. La. Ch. C. art. 702 E. The judicial system is required to protect the child’s right to thrive and survive, and not just preserve the parent’s right. State in Interest of SM, 98-0922 (La. 10/20/98), 719 So.2d 445; State in Interest of CS, 49,955 (La.App. 2 Cir. 3/18/15), 163 So.3d 193.
When the goal plan is changed from reunification to adoption, DCFS may file to terminate parental rights under. La. Ch. C. art. 1004. State in Interest of PB, 49,668 (La.App. 2 Cir. 12/17/14), 154 So.3d 806. Grounds for termination of parental rights include, inter alia, misconduct of the parent toward the child that constitutes “extreme abuse, cruel and inhumane treat *606 ment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction” of “a .felony that has resulted in serious bodily injury.” La. Ch. C. art. 1015 (3)(h). Cruelty to juveniles carries a sentence of up to 10 years at hard labor and is thus defined as a felony. La. R.S. 14:93 D; 14:2 A(4); State in Interest of SCD, 46,881 (La. App. 2 Cir. 11/2/11), 80 So.3d 3.
A juvenile court’s findings of fact may not be" reversed in the absence of manifest error. In re AJF, 2000-0948 (La. 6/30/00), 764 So.2d 47. A juvenile court’s permanency plan determination also may not be reversed in the absence of manifest error or unless it is plainly wrong. State in Interest of CS, supra; State in Interest of HM v. TM, 44,446 (La.App. 2 Cir. 5/6/09), 12 So.3d 409.

Discussion

CP has appealed raising four assignments of error and two arguments. He concedes that the case is governed by manifest error, In re AJF, supra. By his first assignment he urges the court committed manifest error when it failed to change the case plan goaí to adoption. By his second assignment he urges the court committed manifest error when it granted overnight visits for the mother. He reiterates the facts, stressing the “horrific abuse” of CP, AP’s admission over a year after removal that she was not ready to have CP returned to her, and AP’s “conflicting and evolving stories” about how he was injured. He cites the grounds for termination of parental rights, La. Ch. C. art. 1015 (3), and argues that CP’s injuries were much worse than those in State in Interest of SD, 31,192 (La.App. 2 Cir. 8/19/98), 717 So.2d 265, in which this court reversed a finding of reunification and ordered termination. He also cites the standard of proof for a permanency hearing, La. Ch. C. art. 702 C(l), to argue that AP was not really complying with the case plan or making significant measurable progress.
By his third assignment CP urges the court committed clear and manifest error when it found DCFS failed to make reasonable efforts in reuniting the family. By his fourth assignment he urges the court’s findings of fact were clearly wrong. Specifically, he attacks the finding that DCFS could have scheduled a mental health evaluation while AP was in jail, and contends that incarceration is not a defense for a parent’s failure to get an evaluation, State in Interest of MH, 40,332 (La.App. 2 Cir. 9/23/05), 912 So.2d 88. He further contests the findings that (1) AP made substantial progress in correcting any conditions causing the separation of the family, (2) AP and CP have a strong and positive emotional relationship, which is worth preserving, and (3) it is highly likely CP can safely return within a reasonable period of time. He contends that AP’s continued denial and “cover-up” of how the child was injured refute the first finding, and that absolutely no record evidence supports the second two. He concludes that this court should reverse the judgments, enter a permanent case of adoption, terminate AP’s visits with CP, and rule that DCFS made reasonable efforts to reunite mother and child.
DCFS has filed a brief aligning itself with CP and especially contesting the finding that the agency failed to make reasonable efforts in assisting AP. DCFS also shows that in- its oral reasons of May 16, 2016, the juvenile court made no finding as to reasonable efforts, but added it only after this court instructed the lower court to provide written reasons. DCFS submits that contrary to the court’s finding, the agency fully complied with every aspect of the Children’s Code.
*607 In our review of this long and contentious record, we are constrained by the appellate function, which is not to decide whether the juvenile court’s finding was right or wrong, but only whether it was reasonable on the evidence. Hayes Fund v. Kerr-McGee Rocky Mountain, 2014-2592 (La. 12/8/15), 193 So.3d 1110; Rosell v. ESCO, 549 So.2d 840 (La. 1989). When there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are just as reasonable. Perkins v. Entergy Corp., 2000-1372 (La. 3/23/01), 782 So.2d 606. Only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Hayes Fund v. Kerr-McGee, supra. The manifest error rule is based not only on the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but on the proper allocation of trial and appellate functions of the respective courts. Id.; Hayes Fund v. Kerr-McGee, supra.
From the cold record, we would agree with much of CP’s and DCFS’s argument. The photos and medical records show that CP suffered a severe beating resulting in serious bodily injury on March 23, 2015; AP was the first person to discover this, and later pled nolo to a felony charge of cruelty to juveniles; she also admitted leaving the child with various women in the preceding days, but would not incriminate any of them. Taken together, these facts could suggest either that CP did in fact whip the child brutally, or at least was grossly negligent by leaving him in the care of someone who did. On the other hand, AP resolutely denied that she beat the child; she, not DCFS, initially took CP to the hospital for medical treatment; AP’s mother, and the mother’s boyfriend, confirmed that -they had never seen her commit a single act of cruelty toward CP; and all witnesses admitted that aside from this incident, AP had no criminal record. In fact, DCFS has never filed a petition to terminate AP’s parental rights. The record simply does not provide any simple answers.
The juvenile court pointedly asked DCFS’s case worker why the agency, knowing all these facts, initially agreed to a goal of reunification but then suddenly changed its goal to termination. Aside from repeating that CP’s injuries were severe and that AP never admitted responsibility, facts known to DCFS from the outset, Ms. Williams offered only that she was not working the case in its early phase. With the juvenile court, we find the witness’s answer evasive and unconvincing. On this highly contentious record, a rational factfinder could reasonably find that reunification was the preferred goal, under Art. 702 C(1).
Moreover, the record shows that after missing some classes because of incarceration, AP completed the anger management and active parenting classes on April 22, 2016. This evidence shows both DCFS’s reasonable efforts to reunify the parent and child, under Art. 702 E, and AP’s compliance "with the case plan and significant measurable progress, under Art. 702 C(l). AP testified that the classes were helpful, while Mr. Williams’s letter expressed “some doubt” and “clinical concerns” about her parenting skills. On this highly contradictory evidence, we simply cannot say the juvenile court was plainly wrong to find compliance with the case plan and significant measurable progress.
On the question of overnight visits, the evidence is no less conflicting. In its emergency motion to modify the disposi *608 tion, DCFS alleged that “smoking occurred while the child was at [AP’s] home.” The medical evidence shows that AP has reactive airway disease and other health issues. Mrs. Eppers testified that returning from both overnight visits in June 2016, CP brought home a duffel bag that reeked of cigarette smoke and garments that had been washed in scented detergent, perhaps in a futile effort to mask the tobacco smell; Ms. Smith, the CASA supervisor, saw ashtrays full of butts all over the house on June 3, and Mr. Sandifer, the CASA volunteer, testified that the odor of cigarettes was wafting through the front door and onto the porch on June 18. However, none of these witnesses saw AP smoking in CP’s presence, and AP, as well as Rhonda and Roger, all denied that anybody was smoking around the child. The juvenile court may well have been unfavorably impressed that DCFS failed to prove the main allegation of its emergency motion.
Ms. Hunt’s observation that CP seemed not to “interact” well with his grandmother, and Mrs. Eppers’s testimony that the nearly 2-year-old boy seemed “angry” after each visit, do not add much to the resolution of the issue. Obviously, once the juvenile court decides to retain the goal of reunification, visits are a crucial step toward reuniting parent and child. On this difficult record, we cannot say the juvenile court abused its discretion in continuing the supervised overnight visits. For these reasons, we perceive no manifest error. The assignments of error lack merit.
We must observe, however, that when reunification is determined to be the permanent plan for the child, the court shall advise the parent that it is her obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. La. Ch. C. art. 702 G. “Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed.” Id. The juvenile court orally admonished AP to exercise some self-control and quit undermining her employment. Permanency hearings must be held at least every 12 months, and earlier “for good cause shown.” La. Ch. C. art. 702 B. This court would add that on the instant record, that even a small transgression or deviation from the plan could easily result in a change from reunification to adoption and a proceeding to terminate AP’s parental rights. AP is strongly urged not only to comply with the terms of the plan and the principles of the parenting and anger classes, but also to avoid creating the appearance that she is not complying.[2] This may be her final chance to keep CP.

Conclusion

For the reasons expressed, .the judgments are affirmed. Appellate costs are not assessed. La. R.S. 13:4521, C. C. P. art. 1920.
AFFIRMED.

. Counsel for CP also mentioned Faceboolc posts in which AP allegedly disrespected her supervisor and called a staff meeting a “waste of time”; AP countered that she never mentioned the supervisor’s name, or anybody, and that her remarks were merely general. Notably, neither side offered a printout, screenshot or other copy of, or link to, this spurious post.

. In fact, the juvenile court set the next review for September 22, 2016, The outcome of that hearing is obviously not part of the instant record.