CARAWAY, J.
|,After the minor child had been adjudicated in need of care three times, had nine placements and remained in foster care for almost five years, the trial court changed the permanent goal from reunification with the child’s parents to adoption. The mother has appealed the judgment. For the following reasons, we affirm.

Facts

By Instanter Order dated August 13, 2009, 5-year-old P.B. (born 6/11/04) was removed from the home of his mother, 25-year-old April Brown (hereinafter *808 “Brown”),[1] on the grounds of dependency and lack of supervision arising from Brown’s drug use,[2] and placed in the custody of the Louisiana Department of Social Services (hereinafter “State”).[3] At the time, Brown was not married to or involved with P.B.’s father, Willie B.
In early August 2009, Brown had been admitted to a hospital by physician’s emergency commitment due to her attempted suicide. In the three days prior to the commitment, Brown had smoked over $2,000 worth of crack cocaine and consumed an entire bottle of antiseizure medication. In the week prior to her hospitalization, Brown was observed by family members exhibiting behavior which suggested drug use. Brown’s older |2child had observed her mother go into the bathroom and smoke crack with other individuals; the children were left alone on more than one occasion. Upon Brown’s release from the hospital, she left town with an unknown male. She returned on August 12, 2009, and attempted to retrieve her children from her grandmother. Following police intervention, the State obtained the Instanter Order.
The lengthy timeline of the events for this case puts into perspective the issue on appeal concerning the disputed permanency ruling, as follows:
November 2, 2009 — By stipulation, P.B. was adjudicated a child in need of care and placed in the home of Brown’s grandmother. P.B. exhibited behavioral concerns and demonstrated sexual acting out. He was placed on medication. March 16, 2010 — Review Family Team Conference Report indicated that Brown had not completed the case plan. Brown maintained unstable housing as she had no home of her own and lived with a boyfriend, failed to complete substance abuse treatment, had tested positive for cocaine three times (including an admitted September 2009 drug binge), and was not mentally stable. The state set forth a goal of reunification for P.B. August 2010 — Second Administrative Team Review report indicated that Brown had “made very little progress on her case plan.”
September 13, 2010 — Permanency hearing judgment maintained reunification as the permanent plan for P.B. and his mother
September 17, 2010 — P.B. placed in the home of his father, Willie B., and his wife.
February 17, 2011 — Judgment granted formal custody of P.B. to Willie B.
March 14, 2011 — P.B. was removed from his father’s home by Instanter Order on the grounds of physical abuse and neglect, threatened harm, dependency and bruises.[4] Willie was arrested for domestic abuse battery arising from a physical altercation between |3Willie and his wife *809 February 27, 2011. P.B. was placed in the custody of the State.
May 4, 2011 — Brown arrested for contempt/possession of drug paraphernalia.
July 18, 2011, August 15, 2011 — P.B. was adjudicated a child in need of care pursuant to parents’ stipulations. Reunification was continued as permanent plan. Parents were granted visitation.
September 12, 2011 — Administrative Review Family Team Conference Report placed P.B. in the home of Danny K. Brown visited P.B. on April 29, May 19, June 16, and July 7, 2011. She was unable to attend a July 27, 2011 visit because she was incarcerated.[5] The report concluded that Brown had not made any progress on her plan. She failed to address her mental health problems and had not refrained from drug use despite her completion of a substance abuse assessment.
October 20, 2011 — P.B. placed in the home of a cousin and his wife, Noah and Allyson Brandon. At this time, the State changed the goal from reunification to adoption.
February 23, 2012 — Permanency hearing judgment approved goal of adoption for P.B. Brown moved out of her boyfriend’s (Paul McGhee’s) home after the two had a fight.
February 29, 2012 — Brown moved in with husband, Gary G.
March 15, 2012 — Brown met requirements of Enriched Day Program. Began continuing care program held each Thursday evening. Attended all sessions and tested negative on all drug screens and alcohol swabs.
March 20, 2012 — Brown’s mental health was stable. She had attended all monthly mental health counseling sessions since January 2012.
April 13, 2012 — Brown consistently attended parenting classes. Visited P.B. in January, February, March and April 2012.
14July 11, 2012 — Brown refused to give urine sample; given positive code and did not return next day for further testing; she missed July visit with P.B. July 20, 2012 — Brown moved out of home with Gary G. and back in with boyfriend, Paul McGhee.
August 2012 — Brown’s whereabouts unknown until she called the State on August 13, 2012.
August 13, 2012 — P.B. placed in new foster home of Jennifer and Chris Trom-batore.. Brown visited with P.B. on August 15, 2012.
September 2012 — Brown attended scheduled visit with P.B.
October 22, 2012 — Court dismissed Brown’s Motion to Modify Goal of Adoption due to Brown’s failure to attend. Court observed that Brown had failed to establish a stable address because she kept moving back and forth between her husband and boyfriend.
November 27, 2012 — Brown filed second Motion to Modify Disposition of Adoption to Reunification.
February 14-March 12, 2013 — State lost contact with Brown.
March 12, 2013 — State filed Petition to Terminate Parental rights.
March 28, 2013 — By agreement of the parents, the State and P.B.’s counsel, a *810 guardianship of P.B. was granted to Clara and Billy Joe Williams. Permanent plan changed to guardianship.
June 18, 2013 — P.B. removed from the Williams home and placed in state custody by Instanter Order on grounds of Neglect/Dependency after the Williamses refused to pick P.B. up from a behavioral hospital due to the child’s defiance and threats and physical aggression towards the guardians’ grandchildren.
June 19, 2013 — P.B. placed in new foster home of Marcus and Christie Coleman.
July 8, 2013 — Judgment terminated Guardianship. Brown exercised scheduled visitation with P.B.
July 17, 2013-Brown exercised scheduled visitation with P.B.
August 2013 — Brown consistently at-, tending 12-step program. She had negative drug screen. Brown exercised scheduled visitation with P.B.
| ^September 2013 — Parents stipulated to adjudication of P.B. as child in need of care. Brown exercised scheduled visitation with P.B. and had negative drug screen.
October 2013 — Brown had positive hair sample for cocaine, opiates and hydroco-done. Admitted to using cocaine in July 2013. Brown exercised scheduled visitation with P.B.
November 2013 — Brown exercised scheduled visitation with P.B.; referred to drug rehabilitation group.
December 9, 2013 — Family Team Administrative Review Conference held. Court approved case plan including permanent goal of reunification for P.B. and his parents.
June 16, 2014 — Last case plan continued goal of reunification.[6]
June 18, 2014 — P.B. filed Motion to Change Goal to Adoption or Transfer Guardianship on the grounds that P.B. had been in State custody for almost 5 years which included 3 adjudications as a child in need of care, nine placements and lack of parental stability, including Brown’s lack of a long-term relationship.
During a multiple-day hearing, beginning June 19, 2014, and concluding on July 23, 2014, the trial court heard evidence on the permanency determination/motion for goal change. The witnesses included Brown, who was confronted with the results of her most recent drug screening of June 25, 2014, in which she tested positive for cocaine. The state case worker, the foster parent, Christie Coleman, and the counseling professional, Phyllis Taylor, were among the witnesses. With the presentation of evidence concluded, that State argued that a 90-day extension of the goal of reunification was appropriate due to the parents’ considerable progress. Brown concurred in the State’s position. P.B.’s counsel urged that due to the length of time in which the parents had been | ^working toward stability and their lack of success, the best interest of the child required a changing of the goal to adoption or alternatively granting guardianship to the foster family.
Following the hearing, the trial court rendered dral reasons for judgment as follows:
And today we are now looking at him being in custody for a period of over five years that he’s been in custody. He has been in State’s custody for one-half of his life. He ... I will say, had it not been for his desire to be reunified with his mother when he .came into custody this last time, the goal after that would *811 have been adoption because that’s what the goal was up until that point. There had been four years to complete the case plan and very little progress. Ms. Brandy, the DCFS worker assigned to the ease testified that the parents have completed everything on their case plans. But the evidence showed otherwise. Both of the parents ... the evidence clearly showed that both parents have made progress and perhaps even more than ever before. And the Court was especially pleased with the things that mom is now doing. She’s in aftercare. She routinely attends AA, NA, Celebrate Recovery. She’s in church. She’s in the heart to home ministry. She has a sponsor. She’s taking some baby steps with her other children, recognizing that it takes baby steps to get there. She’s begun the process of stabilizing relationships and becoming stable with her mental health issues. However, neither parent has completed the case plan, and that’s what the evidence shows. Neither parent currently has stable income or stable home. They have begun to show some stability but it’s not there, both in respect to the physical place that they have and the relationships with other people in their lives, including their other children and significant others. The evidence shows that neither has made significant contributions of support to [P.B.]. Despite Mom’s progress she does have a June 25, 2014, positive drug screen for ... positive hair follicle test for cocaine. Father has not made all of his visits and has not kept his phone contacts. The parents are still not demonstrating appropriate parenting skills and a bond with their child. According to Ms. Taylor, who is [P.B.’s] therapist, in her opinion it would be detrimental to return him to his parents. She specifically testified that he will regress if returned to his parents. And the Court finds her testimony credible and 1 give it great weight. The Coleman’s is ... the Coleman’s home is [P.B.’s] ninth placement. It has been the longest placement he has had and clearly the most stable placement. Ms. Coleman ... I’m sorry, Ms. Taylor relates that [P.B.] feels safe and secure in this placement. There he is loved, he is nurtured, he is supported in a consistent manner in a stable family that, places a very |7high priority on [P.B.’s] needs. According to Ms. Taylor, this is a requirement for [P.B.] to continue to make progress in treatment. And the Court finds that testimony to be credible. All of the witnesses agree that [P.B.] is thriving in this placement. And that’s the first time that has been the case in all five years that he’s been in care. He is beginning to manage his anger that he has and he is beginning to be able to express his emotions in an appropriate way. The evidence clearly shows that [P.B.] loves both of his parents, but that he lacks a bond with his dad and with his father’s other children. The evidence also shows that he does have a bond, although minimal, with his mother and the siblings on his mother’s side; his mother’s other children. So, considering [P.B.’s] health and safety is the paramount concern, I do find that the permanent plan of adoption is the most appropriate and in his best interest.
The court also found that the State exceeded reasonable efforts at reunification and that family treatment was no longer in P.B.’s best interest. The Court temporarily suspended P.B.’s visitation with his parents for six weeks.
Brown has appealed the judgment raising seven claims of manifest error in the ruling. Brown contends that the trial court erred in finding that she had not completed her plan, ignoring La. Ch.C. art. *812 702(C), changing the goal from reunification to adoption when no grounds existed to terminate her parental rights. She also argued that the court placed undue emphasis on the preference of the child and erred in failing to follow the State’s recommendation for reunification.[7]

Law

More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445. Furthermore, aj^child has an interest in the termination of rights that prevent adoption and inhibit that child’s establishment of secure, stable, long term, continuous family relationships. Id.
The court is required to determine the permanent plan for the child that is most appropriate and in the best interest of the child. La. Ch.C. art. 702(C). Two placement priorities include reunification, or the return of the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home, and adoption. In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch.C. art. 702(C)(1).
In most permanent plan determinations, the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child’s placement in an alternative safe and permanent home in accordance with the child’s permanent plan. The child’s health and safety is the paramount concern in the -court’s determination. La. Ch.C. art. 702(E).
To reverse a trial court’s permanency plan determination, an appellate court must find from the record that the trial court’s finding is clearly wrong or manifestly erroneous. State ex rel. H.M. v. T.M., 44,446 (La.App.2d Cir.5/6/09), 12 So.3d 409; State ex rel. J.B. v. J.B., Jr., 35,486 (La.App.2d Cir. 2/27/02) 811 So.2d 179; State ex rel. S.D. v. D.M.D.B., 36,406 (La.App.2d Cir.8/14/02), 823 So.2d 1113.[8]
After the goal plan is changed from reunification to adoption, the Children’s Code provides for the filing of a petition for termination of parental rights under La. Ch.C. art. 1004. The grounds for termination of parental rights are contained in La. Ch.C. art. 1015. In relevant part, those grounds include: 1) abandonment of the child by the parent by placing him in the custody of a nonparent or the State under circumstances demonstrating an intent to permanently avoid parental responsibility, and/or, 2) at least one year has elapsed since the child was removed from the parent’s custody; there has been no substantial parental compliance with a case plan; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future considering the child’s age and his need for a safe, stable, and permanent home. La. Ch.C. arts. 1015(4)and (5).
In the context of both termination of parental rights and evaluation of *813 permanency plans, the courts have used a reformation test to determine if a plan of reunification is consistent with the best interest and special needs of a child. State ex reí. S.D., supra. This test evaluates whether there is an expectation of reformation of a parent’s conduct and indicates that no such expectation exists when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. Conduct | insuch as behavioral or mental disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. Id. However, a reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although all of the problems that exist have not been eliminated. State in the Interest of S.M., supra; State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993).
Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent’s care and custody. State in the Interest ofS.M., supra. Stability in the home environment and relationships is a consideration in the permanency plan determination. Id.[9] A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. Id.
That children have a need for permanency is well established in the jurisprudence and it is not the intent of either state or federal law that children remain in foster case permanently. State in the Interest of S.M., supra; State ex rel. J.M., 02-2089 (La.1/28/03), 837 So.2d 1247; State ex rel. C.E.C. v. D.M.D.B., 40,409 (La. App.2d Cir.9/28/05), 912 So.2d 418. |nThus, the length of time a child has been forced to remain in foster care is a factor the courts consider in the termination of parental rights decision. Id.

Discussion

Until his placement in the Coleman foster home in June 2013 at age 9, P.B. had experienced almost five years of emotional toil and turmoil dating back to 2008, even before the State’s intervention. Much of this instability and harm to the child caused by his parents occurred while the goal in this state action under the Children’s Code was reunification of the child with the parents. Coincidently, in June 2013, as P.B.’s life found stability, Brown began some progress away from the drug dependency which had ruled her life and thwarted her ability to act as a parent. Nevertheless, most telling for the assessment of Brown’s life for the year leading up to the trial court’s July 2014 ruling is the fact that the State continued mechanically with plans for reunification, seeking in June 2014, only the continuation of the Case Plan with further delay for some contingent, distant reunification. The State’s next “Progress Review Date” was proposed for December 31, 2014.
In response to the State’s June 19, 2014 Case Plan for the continuation of such *814 instability in the child’s life, the child’s attorney moved the court to change the case goal to adoption. The action was supported by the counseling services rendered by Phyllis Taylor. Taylor was qualified as an expert in licensed professional counseling and registered play therapy. She began to meet with P.B. for counseling in December 2012 through April 2013 and again in June 2013 through the time of the hearing. 1 ^Taylor saw P.B. a total of 49 times to address his aggressive and destructive behavior and issues with his parents. Taylor testified that P.B. indicated to her that the source of his anger was his parents’ drug use and the instability he experienced in foster care. Taylor felt that P.B. required stability, nurture, support and consistency in his placement. Taylor testified that P.B. has “some fearfulness” about both of his parents going back to drug or alcohol abuse. Taylor explained that P.B. loves his mom but he is scared of the possibility that things will not be any different. She felt that his current placement was providing for those needs and had done better with his present placement than he had with his aunt and uncle. She stated that he had “done extremely well” and “made a lot of progress,” including doing “a lot better” with anger management. In Taylor’s opinion, P.B. has bonded with his foster family. In fact, he told her that he loved them. Taylor stated that in her opinion, P.B. would regress if placed in Brown’s home.
While we have thoroughly reviewed the trial testimony of the state case worker and Brown along with the other witnesses, we reject Brown’s assignments of error that the trial court was manifestly erroneous in its conclusions. In June 2014, the parents had not completed their case plans. Instead, the State’s proposal for the case plan had built in further delay for the measure of their performance at the end of 2014. The proposed extended time period, falling on the heels of the prior five years of protracted state action for this child in need of care, would be detrimental to this child, who at 10 years old, understood the importance of the security he had finally obtained. Article 702(C) has not been violated by the trial | ^court’s ruling’as the parents did not make significant measurable progress when reunification was attempted from August 2009 until June 2014.
Accordingly, we find that the trial court properly followed the Children’s Code provisions in determining the permanent plan of adoption for this child. Adoption is the most appropriate goal and in the best interest of P.B.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Brown.
AFFIRMED.

. During the case, Brown had been married to Gary G. She now uses the surname Brown in her appellate brief.

. The State had investigated Brown and her family previously based upon reports that she had overdosed on a prescription drug and abused cocaine in November and December 2008. She had been admitted to several psychiatric hospitals and had been diagnosed with pseudoseizures, medical noncompliance and drug dependency.

. P.B.'s 6-year-old sister, Marissa (born 2/15/03), the child of Brown and Danny K., was also removed from the home and eventually placed with her father. Brown also had a third child, K.G. (born 3/17/08), who was then living with his father, and Brown’s husband, Gary G. The two older children, P.B. and Marissa, had been residing with Brown’s grandmother for four weeks prior to removal.

. Willie's two other sons were also removed from the home at that time.

. Willie was also arrested on August 5, 2011, for unauthorized use of a motor vehicle, violation of protective order, two probation violations, failure to pay a fine, forgery and cruelty to the infirm. Both domestic abuse charges were alcohol related. At the time of the report, Willie remained incarcerated. He was hospitalized from June 12-16 after being beaten up in a drug deal.

. The trial court ultimately denied approval of this plan on July 24, 2014 after hearing and granting P.B.’s motion to change goal from reunification to adoption.

. Willie and the State did not appeal the ruling but filed briefs adopting Brown’s arguments.

. The court may modify a judgment of disposition on its own motion or on the motion of the district attorney, the department, the child, or his parents. La. Ch.C. art. 714(A). Because P.B. requested a more restrictive disposition, a contradictory hearing was required. La. Ch.C. art. 714(B)(2). The judgment is appealable under La. Ch.C. art. 710.

. In State in the Interest of S.M., supra, the court considered that the mother failed to establish a residence of her own and changed residences frequently. She also consistently and repeatedly entered into brief, unstable relationships with men, and each of the four children was fathered by different men.