BROWN, C.J.
*944 In this child in need of care proceeding, the father appeals a trial court's judgment changing a case plan goal from reunification to adoption for the father's six children. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
The six children, K.B., age ten, B.B., age nine, A.B., age six, S.B., age four, Ki.B., age three, and Am.B., age 17 months, were removed from their parents' custody on March 18, 2016, based on allegations that the children were in need of care pursuant to La. Ch. C. art. 606(A) due to neglect and a lack of supervision for all six children, and the physical and sexual abuse of S.B. On March 17, 2016, S.B. was taken to the emergency department at Glenwood Regional Medical Center in West Monroe with a broken right femur. S.B.'s mother, B.B., and father, W.B., alleged that S.B. had fallen at their home and broken her leg.
The physicians at the medical center stated that S.B. had a spiral fracture of her femur, which was inconsistent with the parents' story of how S.B. was injured. A more thorough examination of S.B. was made, and doctors discovered signs of sexual abuse. After further investigation, B.B., the mother, revealed that on March 15, 2016, W.B. came to her while they were in the home and said that he thought he had broken S.B.'s leg when he grabbed her by her leg. Thereafter, the father was arrested and taken to the Ouachita Correctional Center.
The children were placed in the custody of the Louisiana Department of Children and Family Services ("DCFS"), and a continued custody hearing was held on March 21, 2016. The children were placed with foster families. At a hearing on June 2, 2016, the parents stipulated that the children were in need of care; the juvenile court accepted the stipulation and adjudicated the children as children in need of care under Title VI of the Louisiana Children's Code. The children had been removed from the parents' custody on two prior occasions. The children's custody was continued with DCFS at the conclusion of the June 2016 custody hearing. The case plan goal at that time was reunification with a secondary goal of adoption. At a permanency hearing held on April 24, 2017, the mother informed the court that she wanted to voluntarily surrender her parental rights. The court approved the voluntary surrender and signed a judgment terminating her rights on July 20, 2017.
At the permanency hearing held on March 16, 2017, DCFS submitted a report which stated that the father had retained adequate housing for the children and had completed his parenting and batterer's intervention classes, as well as a mental health evaluation. In January 2017, the father was referred to additional parenting classes in order to sufficiently parent his six children, four of whom had special needs. DCFS was unable to verify the father's social security income. The DCFS report also stated that the father had not explained or acknowledged how or why he broke S.B.'s leg. The DCFS report expressed concerns about his being able to effectively parent and supervise his six children alone. That concern was echoed in an April 24, 2017, report submitted to the *945 court by the Court Appointed Special Advocate ("CASA") volunteer.
At a permanency hearing held on August 21, 2017, a DCFS worker and CASA volunteer each testified that it was in the best interest of the children that the permanent case plan goal be changed to adoption. The court found that the father had not adequately completed his case plan and ordered that the permanent case plan goal be changed to adoption. The father has appealed from this judgment.
DISCUSSION
The father has urged three assignments of error: 1) that the trial court committed manifest error when it ruled that the parents had not completed their case plan; 2) it is manifest error for the trial court to ignore the plain language of La. Ch. C. art. 702(C) ; and 3) the trial court committed manifest error when it found that DCFS had made reasonable efforts to reunite the family.
The health, safety, and best interest of the child is the paramount concern in all child in need of care proceedings and in the development of the case plan. La. Ch. C. arts. 601 and 675. La. Ch. C. art. 702 concerns permanency hearings and states in pertinent part as follows:
(C) The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
...
(E) Except as otherwise provided in Article 672.1, the court shall determine whether the department had made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.
In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch. C. art. 702(C)(1) ; State in the Interest of P.B. , 49,668 (La. App. 2 Cir. 12/17/14), 154 So.3d 806. Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody. Stability in the home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must make some action in furtherance of the intention to avoid having those rights terminated. Id.
To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous.
*946 State in the Interest of N.B. , 51,374 (La. App. 2 Cir. 02/15/17), 215 So.3d 398 ; State in the Interest of C.S. , 49,955 (La. App. 2 Cir. 03/18/15), 163 So.3d 193. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State in the Interest of P.F. , 50,931 (La. App. 2 Cir. 06/22/16), 197 So.3d 745 ; State in the Interest of N.C. , 50,466 (La. App. 2 Cir. 11/18/15), 184 So.3d 760.
Where there is conflicting testimony, reasonable evaluations of credibility and inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. State in the Interest of E.M. , 51,511 (La. App. 2 Cir. 6/2/17), 224 So.3d 1122.
The father argues that he has made significant progress toward completing his case plan because he: (1) attended his initial parenting classes and batterer's intervention classes; (2) sought a required mental health assessment and has been compliant with taking his prescribed medications; and (3) obtained adequate housing for his children. However, the record shows that he has not completed a second round of parenting classes; in fact, he missed so many classes that he was dropped from the program. DCFS has also been unable to verify employment and his Social Security Income. He does not have reliable transportation. He also has not acknowledged how S.B.'s leg was broken or taken responsibility for his role in that incident. This case is not so much about the father's progress with his case plan, but, rather, about the special needs of the children involved. Several of the children have weekly and sometimes daily visits with therapists and other health care professionals to get the care they need.
The youngest child, Am.B., now age three, was 17 months old when she was removed from her parents' care. At that time, Am.B. had the appearance of an eight-month-old, she could not walk or eat solid food, and she had a five-word vocabulary. She also had chronic diarrhea due to a milk allergy, yet milk was the only thing Am.B. was being fed prior to removal. Her diarrhea has resolved, and she is now walking and talking. Am.B. now receives speech therapy and special instruction therapy.
Ki.B., now age five, was diagnosed with global developmental delay syndrome, ADHD and epilepsy, for which she now takes medication. Ki.B. receives daily Applied Behavioral Analysis ("ABA") therapy and physical, occupational and speech therapy several times a week; she also sees a counselor regularly.
S.B., now age six, attended counseling and has since been discharged; however, her counselor warned that S.B. will require additional counseling if she is returned to her father. S.B. was examined by a doctor two months after her leg was broken to evaluate the alleged sexual assault committed against her. The examining doctor, in his sparse report, found no evidence of sexual assault. The CASA volunteer and an examining nurse practitioner doubt the doctor's assertion that S.B. was not sexually abused. S.B. has stated that she wants to be adopted.
A.B., now age eight, was diagnosed with an autism spectrum disorder, 14q11.2 Microduplication Syndrome, a rare genetic disorder, and ADHD. A.B. was born with fetal alcohol syndrome, and his mother *947 tested positive for drugs and alcohol at delivery. A.B. has developmental delays and receives speech and occupational therapy, adapted physical education and special education services through his school. A.B. is unable to perform self-help activities, such as brushing his teeth and bathing; his foster mother must do those things for him. A.B. also has deficiencies in motor, adaptive, academic and communication skills and is unable to express when he is hurt or afraid. A.B. has significant speech problems and has been given a speech generating device which required that his teacher attend special classes in order to operate. A.B. was shy and withdrawn prior to removal, but in foster care, he has made significant progress and has been able to make friends due to his improved ability to communicate.
B.B., now age 11, was diagnosed with an autism spectrum disorder and developmental and speech delays, and she had trouble with aggressive behavior, fighting with others and lashing out and yelling prior to entering foster care. B.B. was scheduled to complete her services, which included physical, occupational, speech and ABA therapy multiple times a week, as well as weekly in-home counseling, as of August 2017. B.B. has stated of returning to her father's care, "[N]o, please don't send me back. I want to be adopted."
K.B., the oldest child, now age 12, meets with a counselor weekly, and has had trouble controlling outbursts toward her foster parents and siblings. K.B. shares a foster home with B.B. and the five-year-old Ki.B. K.B. has stated that she wants to be adopted and does not want to return to her father's care. K.B. has expressed the belief that as soon as the children's services are complete, the living situation with her father would return to the appalling condition it was prior to removal, which is what happened when the children were removed twice before. K.B. stated that she was proud of her mother for terminating her parental rights and thanked her mother for doing so.
The six children are currently spread among four foster homes. Each foster family has expressed the desire to adopt their respective children. Significant coordination is required to get the children to their various therapy and doctors' appointments and counseling sessions, which one stay-at-home foster parent described as "a full-time job."
The CASA volunteer and DCFS worker expressed grave concerns as to whether the father is capable of adequately parenting his six children, given their special needs and that he "cannot fully understand the educational, emotional and physical needs of his children." He will be a single parent who must work full-time to provide a home and food for his children in addition to getting his children to their required appointments. He does not have reliable transportation to take his children to those various appointments. The oldest child, K.B., has expressed the fear that, if the children are returned to their father's care, she will be required to ensure that the children are fed, clothed, bathed, and arrive at school on time, effectively making her the children's mother at the age of 12.
The best interest of these children is of paramount concern. Nearly two years have passed since the children were removed from their parents' care and placed in DCFS custody. Since that time, the children have gained stability in their home lives. It is imperative to each child's well-being and emotional and mental health that this stability continue. The father has made some progress toward completing his case plan, but the best interest of the children in this case strongly favor adoption. It is for those reasons that we find that the trial court did not err in changing *948 the case plan from reunification to adoption.
CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court changing the permanent case plan goal in this matter from reunification to adoption. Costs of this appeal are assessed to the father, W.B.
AFFIRMED.