Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,065-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
R.W.H.V.

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 21,710

Honorable Sharon I. Marchman, Judge

* * * * *

FREDERICK D. JONES                    Counsel for Appellant,
                                      J.M.E., Grandmother


JOHNNY L. SANDERS, II                 Counsel for Appellee,
Assistant District Attorney           State of Louisiana


COURTNEY W. FRANKLIN                  Counsel for Appellee,
                                      State of Louisiana DCFS


ACADIANA LEGAL SERVICES               Counsel for Appellee,
CORPORATION                           R.W.H.V., Child
By:  Helen M. Marrs


LAYNE M. ADAMS                        Counsel for Appellee,
                                      C.H., Father


VARHONDA E. BURRELL                   Counsel for Appellee,
                                      P.V., Mother

* * * * *

Before WILLIAMS, PITMAN, and McCALLUM, JJ.

**WILLIAMS, C.J**.

In this child in need of care ("CINC") proceeding, the grandmother appeals a trial court judgment that changed the permanent case plan goal for the minor child from reunification to adoption.

## FACTS

In July 2016, the Louisiana Department of Children and Family Services ("DCFS") received a report of emotional maltreatment of R.W.H.V., then five years old, and his sister, T.V., by their maternal grandmother, J.M.E. The children shared a home with J.M.E., their mother, P.V., and their great-grandmother, B.E. As of that date, R.W.H.V. had been hospitalized at Brentwood Hospital, a psychiatric facility, four times in the past two months. The medical professionals had concerns of emotional abuse and dysfunction in the family. Doctors noted that R.W.H.V. was not being allowed to be a child, and that J.M.E.'s complaints about his behavior were unfounded. It was also noted that J.M.E. used extreme and inappropriate methods to discipline R.W.H.V. and his sister, such as feeding R.W.H.V. horseradish, hot sauce, and vinegar as a form of punishment. During one hospitalization, R.W.H.V. was diagnosed with schizophrenia, bipolar disorder, and oppositional defiant disorder ("ODD") based upon his behavior as reported by grandmother, and he was prescribed strong psychotropic medications typically given only to adults.

The family was referred to the Family Services Unit of DCFS in September 2016 to work toward resolution of the family's problems, which seemed to center around grandmother. Other in-home service providers also assisted, providing grandmother with therapy and instruction on coping skills and parenting practices (specifically discipline and how to deal with

tantrums and de-escalate her own emotions first).[1]  These providers included

the Family Services Unit, Ekayah Youth Services, Wraparound of Northeast

Louisiana, People United, and the Family Resource Center.  The providers

reported that grandmother struggled to handle the children's behavior, often

calling the instructors to request assistance, and she had trouble applying the

recommendations of the providers' plans designed to help her manage

R.W.H.V.'s behavior.  The providers reported that J.M.E. consistently over-

corrected R.W.H.V. for age-appropriate behavior.

In December 2016, J.M.E. called R.W.H.V.'s then-treating

psychiatrist, claiming that the child was hitting and kicking other family

members and slamming his head into the wall.  She related that she was

unable to calm R.W.H.V. and was advised to give him anti-psychotic

medication.  J.M.E. took R.W.H.V. to the emergency room four separate

times due to his behavior.  On May 10, 2017, after J.M.E. claimed that

R.W.H.V. was having emotional/behavioral issues, he was again admitted to

Brentwood Hospital and diagnosed with bipolar disorder, attention deficit

hyperactivity disorder ("ADHD"), and post-traumatic stress disorder

("PTSD").

Dr. Calvin Walker, a physician with Brentwood Hospital, informed a

Family Services employee that J.M.E. had related to him that R.W.H.V.

would be removed from the home if he were to be admitted for another

hospital stay.  The Family Services employee informed Dr. Walker that this

information was not true, and he confronted J.M.E., who denied making the

statement to Dr. Walker.  The Family Services worker also learned that

---

[1] After J.M.E.'s participation in individual parenting instruction, DCFS referred her to a 16-week nurturing parenting program.

R.W.H.V.'s medical records showed that J.M.E. had been providing information about the child's behavior to medical providers that was inconsistent with the observations of hospital personnel, physicians, and school officials.

J.M.E. was reticent and resistant to follow the mental health providers' recommendations for R.W.H.V. Beatrice Tatem, his licensed professional counselor, and the treatment team at Brentwood Hospital, opined that the parenting style of J.M.E. and B.E. could be categorized as emotional maltreatment, and the home with P.V., J.M.E., and B.E. did not provide the most nurturing environment to meet R.W.H.V.'s developmental needs.

DCFS requested custody of R.W.H.V. on May 16, 2017. An instanter order removing the child was signed by the juvenile court judge on May 17, 2017, and a continued custody hearing was held on May 22, 2017. DCFS was ordered to work a plan of reunification with J.M.E., and the court found that remaining in the custody of DCFS was in the best interest of R.W.H.V. Both J.M.E. and P.V. had case plans, which included goals in the areas of housing, income, individual counseling, parenting, mental health, domestic violence, and visitation.

On June 13, 2017, the State filed a petition to declare R.W.H.V. a child in need of care. The grounds alleged therein were that R.W.H.V. was "suffering from emotional maltreatment due to the actions of [J.M.E.] (legal guardian), in that she has repeatedly taken him for medical and mental health treatment that appear[ed] to have been unnecessary and ha[s] subjected the child to inappropriate discipline." Also incorporated by reference were the

grounds set forth in the instanter order and affidavit in support (most of which have been set forth above).

An answer hearing was held on July 6, 2017, at which both J.M.E. and P.V. were present. Through appointed counsel, they denied the allegations of the petition and requested a full hearing. At the adjudication hearing on August 7, 2017, J.M.E. and P.V. stipulated that R.W.H.V. was a child in need of care, without admitting any of the allegations set forth in the petition. The court approved the stipulation, finding there to be a factual basis and that DCFS had made all reasonable efforts to prevent removal. The court also found that continued custody with the State was necessary for the safety and protection of R.W.H.V.

A review hearing was held on September 21, 2017. The court found that continuing R.W.H.V. in the custody of the State was the least restrictive option under the circumstances. J.M.E. and P.V. were ordered to attend domestic violence counseling and R.W.H.V.'s therapy was increased. A 90-day review hearing was held on November 16, 2017. The court noted that progress was being made on the case plans, and R.W.H.V. was continued in DCFS custody.

At the review hearing, additional visitation was granted and the gradual transition of R.W.H.V. back into the home was discussed. At a hearing on April 9, 2018, trial placement back into the home was granted and continued counseling for J.M.E. and P.V. was ordered. Thereafter, the permanency hearing was held on May 17, 2018. At that time, the court continued the goal of reunification, maintained custody with DCFS, and continued trial placement of the child with J.M.E. However, multiple problems had arisen during the trial placement and R.W.H.V. was removed

from J.M.E.'s home and admitted to Cypress Grove Behavioral Health in

Bastrop on July 26, 2018.[2]

A review hearing was held on September 13, 2018. Both DCFS and

the Court Appointed Child Advocacy ("CASA") volunteer recommended

_____

[2] During the March 20, 2018, home visit, J.M.E. told the DCFS worker that she was engaged to D.E., a man she had been dating for a few months. The DCFS worker met with D.E. during that visit and on April 9, 2018. On May 3, 2018, J.M.E. texted the DCFS worker to inform her that she and D.E. had just been married. D.E. was asked to come into the DCFS office to be fingerprinted because of his marriage to J.M.E. and his move into the family home. D.E.'s fingerprints were run, and he had 12 arrests, a number of them felonies.

During the April 26, 2018, home visit, the DCFS worker learned that on April 12, 2018, P.V. had been hospitalized for a severe abdominal infection which resulted after a cyst on her ovary ruptured. Emergency surgery was required and P.V. was in the intensive care unit for five days before being discharged on April 17, 2018. No one notified DCFS, who could have offered assistance to J.M.E. during P.V.'s illness and recuperation.

At the May 21, 2018, home visit, P.V. reported that she had been fired from Circle K because she could not return to work due to her surgery and recuperation. P.V. related that she hoped to start cleaning houses in the neighborhood as a source of income. Without P.V.'s income, the family was relying on the income of the great-grandmother (and that of D.E., J.M.E.'s new husband).

In June 2018, R.W.H.V.'s treating psychiatrist, Dr. Agarwal, discharged him from treatment, reporting frustration working with J.M.E., and recommended that a new psychiatrist be found to monitor R.W.H.V.'s medications. R.W.H.V. was being treated for ADHD and ODD. J.M.E. made an appointment for R.W.H.V. with Dr. Vora, another psychiatrist, for a psychiatric evaluation without informing DCFS or using a psychiatrist referred by Intensive Home Based Services, who had been working with the family. Dr. Vora saw R.W.H.V. on July 10, 2018, without the benefit of any of his prior medical records, and diagnosed him with severe ADHD, severe mood disorder, and bipolar disorder. New prescriptions were given to R.W.H.V., at different strengths and dosages than the prescriptions he had been taking under Dr. Argawal's care. DCFS learned that in relating R.W.H.V.'s diagnoses to Dr. Vora, J.M.E. did not disclose a full family or medical history, nor did she tell Dr. Vora about DCFS involvement with the family, including that R.W.H.V. was in the State's custody.

This resulted in R.W.H.V. being without his medication for a period of two weeks. Dr. Agarwal would not refill R.W.H.V.'s prescriptions because she was no longer treating him, and Dr. Vora would not rewrite the prescriptions to conform to the dosages and strengths previously written by Dr. Agarwal without seeing the child again. During the July 19, 2018, home visit, J.M.E. related that she was overwhelmed with R.W.H.V.'s behaviors since he was off of his medications. DCFS advised J.M.E. to have the prescriptions written by Dr. Vora filled, but to give the medications to R.W.H.V. at the dosages previously written by Dr. Agarwal. On July 25, 2018, the DCFS worker spoke with Dr. Buckle, another psychiatrist who works with Dr. Vora. Dr. Buckle related that when she spoke with J.M.E., something was "not quite right." Dr. Buckle opined that Munchausen's [by proxy] could be at issue in this case. On this same date, the DCFS worker learned that D.E. (J.M.E.'s husband) was still in the home (he was not allowed to live in the home since three of his arrests were for battery, a crime that is disqualifying per DCFS regulations). DCFS noted that the behaviors reportedly occurring in the family home were not occurring in R.W.H.V.'s foster placements, and it was believed that they were happening due to the family dynamics and environment. At that time, it was decided that R.W.H.V. would be removed from the home and new placement would be sought.

Later that day, July 25, 2018, J.M.E. called and stated that R.W.H.V. had broken his great-grandmother's wrist and was "uncontrollable.'' She also related that the child was making statements that he would hurt himself or someone else. He was taken to St. Francis Medical Center for evaluation. At the emergency room, J.M.E. reported that R.W.H.V. was off his medication because of DCFS's orders, and his behavior was worse. She reported that R.W.H.V. wanted to kill himself, and that he broke his great-grandmother's arm. The child, however, stated that it was an accident, and that his great-grandmother grabbed his arm, and fell when he pulled away from her. The ER doctor decided to commit R.W.H.V. to monitor him away from his family. R.W.H.V. was hospitalized at Cypress Grove Behavioral Health. When he was discharged from Cypress Grove on August 16, 2018, R.W.H.V.'s diagnosis was major depression disorder NOS, anxiety disorder NOS, ADHD, and suspected physical abuse. New prescriptions were written for him in accordance with the updated diagnoses. R.W.H.V. was placed with a new foster family, and he began attending school after the start of his placement.

that the goal change from reunification to adoption.[3]  At the review hearing on November 5, 2018, the court ordered that all visits between R.W.H.V. and family members were to be supervised at all times by either DCFS or CASA.

The permanency hearing began on January 10, 2019, and concluded on March 11, 2019, and the goal was changed from reunification to adoption.  This goal change is the subject of the instant appeal filed by J.M.E.

## DISCUSSION

J.M.E. contends the trial court erred in finding that DCFS met its burden of proving sufficient grounds existed to change the goal of the permanent plan from reunification to adoption under La. Ch.C. art. 702.  She argues that the goal should have remained reunification since both she and P.V. worked their case plans and have made significant measurable progress toward achieving their goals.  She also argues it was error to change the goal from reunification to adoption since there was a reasonable expectation of reformation as shown through testimony and evidence that both grandmother and mother have cooperated with DCFS and shown improvement, although not all of the problems that existed have been eliminated.

According to J.M.E., both she and P.V. have worked their case plans, including completion of all classes they have been asked to attend.  She asserts that the DCFS supervisor admitted that, as far as the individual items on the case plan, both she and P.V. had "pretty much" done all the things they had been asked to do.  According to the DCFS caseworker, there were

_____

[3]Within its recommendation, DCFS notes that R.W.H.V.'s mother "has been in the home while these things have happened and she has not proven to the Agency that she can protect her child."

6

three issues that prevented the agency from recommending reunification—J.M.E.'s diagnosis of histrionic personality; income issues; and R.W.H.V.'s emotional state when he went home on trial placement.

J.M.E. argues that there is an inconsistency between DCFS's contention that her diagnosis prevents her from parenting R.W.H.V. and its decision to allow R.W.H.V. to return home on trial placement in April 2018. According to J.M.E., there are also two other adults in the house, R.W.H.V.'s mother and great-grandmother, who are a support system for J.M.E. Regarding the issue of income, J.M.E. notes that the DCFS caseworker admitted that the income of B.E. and J.M.E.'s husband is sufficient to take care of household bills.

As for R.W.H.V.'s emotional state while home on trial placement, J.M.E. asserts that it was not her fault (or P.V.'s) that R.W.H.V. was dropped as a patient by Dr. Agarwal and could not refill his prescriptions. She argues that R.W.H.V. ran out of medication because neither DCFS nor the in-home service provider found him another psychiatrist timely. According to J.M.E., she showed initiative by finding a doctor to evaluate R.W.H.V., but she was instructed by DCFS not to give her grandson the medication that was prescribed by Dr. Vora. J.M.E. asserts that DCFS then blamed her for R.W.H.V.'s behavior and removed him from the home.

DCFS asserts that the trial court did not err in changing the goal from reunification to adoption inasmuch as the evidence established that J.M.E. and P.V. failed to make significant measurable progress toward achieving their case plan goals and there is no reasonable expectation of reformation.[4]

---

[4] DCFS has also argued that J.M.E. lacks standing to appeal from the trial court's permanency judgment as she is neither a party to the proceeding nor a parent within the definition of the Children's Code. DCFS did not answer the appeal, so this issue is not properly before this Court. Moreover, since

More than simply protecting parental rights, our judicial system is required to protect children's rights to thrive and survive. *State in Interest of S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445; *State in Interest of P.B.*, 49,668 (La. App. 2 Cir. 12/17/14), 154 So. 3d 806. A child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. *Id.*

The court is required to determine the permanent plan for the child that is most appropriate and in the best interest of the child. La. Ch.C. art. 702(C). The placement priorities include reunification, or the return of the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home, and adoption. In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch.C. art. 702(C)(1); *State in Interest of K.B.*, 51,955 (La. App. 2 Cir. 01/10/18), 247 So. 3d 942; *State in Interest of N.B.*, 51,374 (La. App. 2 Cir. 02/15/17), 215 So. 3d 398; *State in Interest of P.B., supra.*

In the context of both termination of parental rights and evaluation of permanency plans, the courts have used a reformation test to determine if a plan of reunification is consistent with the best interest and special needs of a child. *State in Interest of P.B., supra; State ex rel. S.D. v. D.M.D.B.*, 36,406 (La. App. 2 Cir. 08/14/02), 823 So. 2d 1113. This test evaluates

---

DCFS created a case plan for J.M.E. and treated her as the *de facto* mother of R.W.H.V. for the entire time that the State has been involved with the child, this argument lacks merit.

whether there is an expectation of reformation of a parent's conduct and indicates that no such expectation exists when the parent exhibits prolonged and consistent abusive or negligent behavior, or a long history of substance abuse. Conduct such as behavioral or mental disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. *Id.* However, a reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although all of the problems that exist have not been eliminated. *State in Interest of S.M., supra; State in Interest of P.B., supra.*

Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited reformation, which is shown by "significant, substantial indication of reformation . . . such as altering or modifying in a significant way the behavior which served as a basis for the State's removal of a child from the home." *State in Interest of S.M.*, 719 So. 2d at 450. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. *Id.*; *State in Interest of P.B., supra.*

Whether a parent has complied with a case plan, the expected success of rehabilitation, and the expectation of significant improvement in the parent's condition or conduct are all findings of fact reviewed under the manifest error standard. *State ex rel. J.T. v. J.M.*, 46,090 (La. App. 2 Cir. 12/12/10), 56 So. 3d 1009; *State in Interest of I.H.*, 17-129 (La. App. 3 Cir.

9

05/17/17), 221 So. 3d 129; *State in Interest of O.L.R.*, 13-616 (La. App. 3 Cir. 11/06/13), 125 So. 3d 569.

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Interest of K.B., supra; State in Interest of N.B., supra; State in Interest of C.S.*, 49,955 (La. App. 2 Cir. 03/18/15), 163 So. 3d 193. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *State in Interest of K.B., supra; State in Interest of P.F.*, 50,931 (La. App. 2 Cir. 06/22/16), 197 So. 3d 745; *State in Interest of N.C.*, 50,446 (La. App. 2 Cir. 11/18/15), 184 So. 3d 760.

In the instant case, in order for reunification to remain the permanent plan, mother and grandmother were required to comply with the case plan ***and make reasonable progress toward achievement of its goals, which includes the correction of conditions that caused R.W.H.V. to be in care in the first place***. La. Ch.C. art. 702(C)(1); *State in Interest of S.M., supra; State in Interest of P.B., supra*.

The following is excerpted from the trial judge's oral reasons for judgment:

> [F]irst I will address the mother. The testimony today is uncontroverted that with the exception of going to Dr. Blackham, which she was referred to do, [P.V.] went to everything else that she was required to do. The problem is that she doesn't act as the parent herself, and despite efforts to have her do that she still has not been able to demonstrate that she's able or willing to parent [R.W.H.V.] herself. She relies on her mother and that's clear from all of the testimony. Additionally the testimony today was that [P.V.] was not willing to move out to try to put herself into a situation where she could show that she could do it without her mother. And so for those reasons I

10

find that the State has established its burden of proving that the mother has not complied fully with the case plan and is not making significant measurable progress toward achieving the goals and correcting the problems.

Now I'll switch to talk about the grandmother. . . The testimony that I have heard in this case, specifically from Ms. Tucker (DCFS caseworker) and Ms. Ross (DCFS supervisor), I find to be credible testimony. Their testimony was subject to vigorous cross-examination and they still presented credible testimony. Specifically I find believable their versions of the issues related to obtaining the new psychiatrist for [R.W.H.V.] and the incident regarding the great-grandmother and the wrist incident that ultimately led to [R.W.H.V.] being PEC'd. The testimony of Ms. Tucker and Ms. Ross regarding their issues in dealing with [J.M.E.] is supported by the . . . reports of Dr. Binns and Dr. Blackham and Dr. Agarwal, the testimony of Dr. Tatem and Dr. Young. And so the problem that I see in [J.M.E.] completing her case plan and demonstrating what she needs to demonstrate is that she can effectively and appropriately parent [R.W.H.V.] related to the environmental issues that Ms. Ross testified to when we started today. Those are exactly the things that were related by Dr. Tatem [R.W.H.V.'s] counselor, [who] said that there is lots of chaos in the home, [R.W.H.V.] needs calmness, he needs stability, he needs safety, he needs lack of stress, and this home has stress in it. He needs a nurturing environment, and he is not being provided that within the family. Why that is I can't really say. There's certainly strong evidence of [J.M.E.'s] histrionic personality, which is well-documented, I think Dr. Tatem described it as making mountains out of molehills, and we've had much credible testimony that grandmother exaggerates, not only [R.W.H.V.'s] behaviors but the extent of his mental health problems and the diagnoses that he's had previously. I think that's certainly a contributing factor to the environmental issues that we have . . .

It's clear though and the testimony is overwhelming and very credible that [it] is the situation within this family's home which is detrimental to [R.W.H.V.]. . . . I want to make clear that, similar to [P.V.], [J.M.E.] has done most of the things that she was asked to do. The evidence indicated that she did fail to get the appointment scheduled with another provider after Dr. Blackham's office no longer accepted [J.M.E.'s] insurance, but that's been four or five, almost five months ago and still there is no provider today. The report from Dr. Blackham was that, based on the diagnosis of histrionic personality disorder, [J.M.E.] needs intensive treatment over a long period of time, and even then there is no guarantee that that treatment will work, and at this point in time I don't see an effort to try to even obtain that treatment.

The issues related to the family income or the lack of income of [J.M.E.] and her husband's criminal history are also problematic, but in my view not the main issues. . . . So for the reasons that I have stated, I find that the goal of adoption is the most appropriate and least restrictive goal for [R.W.H.V.].

At the time of the permanency hearing, R.W.H.V. had been in State custody for almost two years, but the State had been involved with the family since June 2016, when, as noted above, DCFS received a report of emotional mistreatment of R.W.H.V. by J.M.E. from the treating medical providers at Brentwood Hospital during one of the then five-year-old child's hospitalizations. DCFS did not change its recommendation in this case from reunification to adoption until September 2018, after it had exhausted all of the resources it had at its disposal in its efforts to help P.V. and J.M.E. make significant measurable progress toward achieving reunification, specifically by addressing and attempting to correct the conditions that caused R.W.H.V. to be in foster care.

The evidence supports the trial court's finding that J.M.E.'s behavior has not changed, as well as the court's determination that P.V. has not demonstrated an ability or willingness to parent R.W.H.V. independently. In fact, it appears from the record that J.M.E. has consistently refused to acknowledge or accept that it was primarily her actions that led to DCFS's involvement with this family or the extreme detrimental impact her behavior has had on her grandson. Instead, J.M.E. has attempted to depict herself as a misunderstood victim of DCFS and the numerous medical providers involved in this case. The record further shows that R.W.H.V. has done well in his current placement, where he is experiencing academic success and enjoying new friendships at school, and he has benefited from the structure and stability of his foster home. We find no error in the trial court's

conclusion that reunification was no longer the appropriate permanent plan for R.W.H.V.

## CONCLUSION

For the reasons set forth above, the judgment of the trial court changing the permanent case plan goal in this matter from reunification to adoption is affirmed.  Costs are assessed to appellant, J.M.E.

**AFFIRMED.**