GARRETT, J.
|TIn this child in need of care (“CINC”) case, the mother, KM, appeals from a juvenile court judgment accepting a case plan of adoption only, and not reunification, for the child, EM.[1] For the following reasons, we affirm.
FACTS
KM was 14 years old when she gave birth to EM on June 24, 2015. Due to KM’s young age during pregnancy, the baby suffers from various health problems, including optic nerve hypoplasia. Simply put, the optic nerve did not develop and EM is permanently blind. EM had three possible fathers. Paternity testing eventually revealed the father to be DG, who was an 18-year-old junior in high school at the time EM was conceived. DG stated that he thought KM was 16. Although it is not entirely clear from the record, DG was convicted of either carnal knowledge of a juvenile or indecent behavior with a juvenile. He is serving a prison sentence as a consequence of his actions with KM.
The record indicates that KM was raised in an unstable environment. She has several younger siblings and lived with her mother, JC, and her father, LM. JC was somewhat disabled after having West Nile virus. It appears from the record that JC may have also abused drugs. JC was not able to control KM, who frequently ran away from home. The Louisiana Department of Children and Family Services (“DCFS”) had records indicating that KM had been the victim of neglect in July 2002, July 2007, and August 2010. JC had an open file with the DCFS from May 2015,12largely dealing with her inability to control KM. The lack of supervision of KM contributed to her pregnancy and the birth of EM.
On September 17, 2015, concerns were reported to the DCFS regarding EM. KM did not appear to be able to care for the baby and frequently left the child with others, skipped school, ran away from home, and sometimes ran away with the baby. She missed doctor appointments for the baby and appointments to obtain food assistance. JC stated that she was not able to care for the baby and could not control KM. According to JC, there were no other family members who could care for EM. KM had planned to allow EM to be adopted by a couple in Texas, but changed her mind.
At the time the DCFS became involved in this case, an employee with a maternity home where KM stayed during part of her pregnancy had EM in her possession and took the child to various doctor appointments. This individual considered adopting EM, but decided against it.
On October 8, 2015, the juvenile court issued a verbal instanter order of removal and signed the order the next day. The court determined that EM was the victim of abuse and/or neglect and emergency circumstances existed requiring that the child be taken into the custody of the DCFS.
A hearing was held on October 15, 2015, and the court issued a continued custody and protective order placing the child in the legal custody of the DCFS due to neglect. The DCFS was ordered to conduct a home study of the paternal grandparents, HG and WG. KM’s visitation with the child was to be supervised. EM was placed in foster care with a nonrelative.
On November 13, 2015, the state filed a petition to have EM declared a CINC. A dispositional hearing was held on February 8, 2016. The |sJanuary 2016 DCFS report to the court, which contained a case *1125 plan with a goal of reunification, was filed into evidence. Among KM’s case plan goals were attending and completing a parenting program,, providing a safe and stable home for EM, attending routine medical appointments for the baby, and remaining in school. At the hearing it was determined that KM was not attending school, but was supposed to return to school the next week. The court ordered a mental health evaluation and ordered KM to attend counseling. The attorney representing EM advised the court that the baby’s paternal grandparents were an excellent resource. The court adjudicated EM a CINC and ordered that the paternal grandparents could have overnight visitation with the baby. The court maintained custody with the DCFS, but placed EM with KM and her mother, JC, instead of continuing the child in foster care.
The case was reviewed by the court on March 10, 2016. KM was 15 at that point. JC said KM was doing what she should to care for EM. The paternal, grandmother, HG, did not share that opinion and stated that she thought KM had issues. She noted that KM often left the baby with her when KM had other things she wanted to do. The case plan goal remained reunification. The case review judgment of March 18, 2016, specified that the child continued to be a CINC and custody was maintained with the DCFS. EM’s placement remained with KM and JC.
Another case review hearing was held on May 12, 2016. An amended case plan for reunification, or adoption in the alternative, was approved. At that point, EM was living with the paternal grandparents. EM was attending a daycare for children with special needs. A report from the daycare that was filed into evidence stated that EM was in much better condition since |4she had been staying with the paternal grandparents. The child was clean and was sent to daycare with formula and extra clothes. The report noted that when EM was living with KM, the baby was not as well cared for and had diaper rash.
KM’s parents were considering a move to Arizona • and, because she was still a minor, KM was in their custody. KM claimed she had. completed parenting and anger management courses. She stated she was not getting along with her mental health counselor and asked that a new one be assigned. The case review judgment continued custody with the DCFS. The baby was allowed to stay with the paternal grandparents. The court stated that KM would be allowed to go to their home for supervised visitation' with EM. The paternal grandparents lived only a block and a half away from KM.
A permanency/case review hearing was held on October 27, 2016, before a juvenile court hearing officer. At that point, EM had been in the custody of the DCFS for one year. The DCFS recommended that the case plan goal be amended to adoption. The paternal' grandparents were prepared to adopt the child.
KM testified that she was enrolled in school, but had not been attending. She stated she was behind in school and it was not “working out” for her. She commented that “I’ll go if it really comes down to it.” KM wanted to get a GED when she turned 16. KM’s parents were in the process of divorcing. JC had moved out of the house and'was living with a friend. KM remained in the family home with her father, LM, who did not attend the hearing. According to KM, her father was not working and her mother | stook the family vehicle when she left, so the family did not have transportation. KM stated she had been taking care of her younger siblings.
KM now had a new boyfriend who was 17 and attending the Youth Challenge Program in Minden. The boyfriend’s mother brought KM to court. According to KM, her boyfriend’s mother said that KM and *1126 EM could live with her. KM stated that she did not want to give EM up for adoption.
KM admitted she had frequently- missed visitation with the baby and acknowledged that the paternal grandparents were taking good care of the child. When questioned by the court, KM admitted that EM has special needs and attends a school for handicapped children. KM said she had missed the child’s doctor appointments because she does not have transportation.
The paternal grandmother testified that EM had been living with her since March 2016. The paternal grandparents became certified foster parents in September 2016. The child went to all doctor appointments and was receiving physical and occupational therapy. The therapists were teaching EM to'walk with a cane due to her blindness.
According to HG, KM was not able to care for EM. KM missed 13 doctor appointments for the child and had visited only seven times, although she had weekly scheduled visitation. HG also said if KM wanted to attend doctor appointments, she could'have accompanied HG. HG opined that EM would be better off with her and WG and that KM had not matured. The paternal grandparents wanted to adopt the child.
Sylviara Hunt, the caseworker with the DCFS, stated that she had trouble contacting KM. At one point, she and KM discussed termination of RKM’s parental rights. A report by the DCFS, dated October 18, 2016, and filed into evidence, showed that after a meeting at the state office building, KM became angry, went to the parking lot, and kicked a car.
Hunt stated that HG takes good care of EM and frequently updates her on the child’s progress. Hunt noted that not much was réquired of KM in her case plan, due to her age.
After the testimony concluded, the hearing officer, determined that it was not safe to return EM to KM. KM could not provide a stable environment and nothing had changed with KM in the year that EM had been in DCFS custody. The hearing officer observed that’KM had the most limited case plan she had ever seen, that the plan was appropriate for KM’s age, and still she had failed to do what was required. The hearing officer found that placing the child for adoption was appropriate. EM was to remain in the custody of the DCFS, with a permanent case plan of adoption by the paternal grandparents. The DCFS was instructed to file’ a petition to terminate KM’s parental rights.
The hearing officer filed recommendations for the permanency/case review hearing, in accordance with the comments set forth above. No written objection to the recommendations was made .by KM pursuant to La. Ch., C. art. 423(F) and (G). The recommendations were adopted by the juvenile court as its judgment on November 28, 2016.
KM .appealed the judgment of November 2016. She also supplemented the record with a transcript of a juvenile court hearing conducted on February 9, 2017.[2]
*1127 |70n appeal, KM argues that the lower court committed manifest error when it accepted a case plan- goal of adoption only, given the unique circumstances, of this case. The DCFS and the attorney representing EM have filed briefs in which they ask this court to affirm the judgment changing the case plan goal to adoption.
LEGAL PRINCIPLES
The health, safety, and best interest of the child is the paramount concern in all CINC proceedings. See La. Ch. C. art. 601. A CINC proceeding is commenced by a petition filed by the district attorney. When authorized by the court, the DCFS may file a petition if there are reasonable grounds to believe that the child is a CINC. See La. Ch. C. art. 631.
. The adjudication hearing is held before the court without a jury. La. .Ch. C. art. 664. The state shall have the burden to prove the allegations of the petition by a preponderance of the evidence. La. Ch. C. art. 665. Following the adjudication hearing, the court shall immediately declare whether the evidence warrants a CINC adjudication. See La. Ch. C. art. 666.
Within 60 days after a child enters the custody of a child care agency, the custodian shall develop a case plan detailing the custodian’s efforts toward achieving a permanent placement for the child. See La. Ch. C. art. 673. The case plan shall be designed to achieve the least restrictive, most family-like, and most appropriate setting available, and in close proximity to lathe parents’ homes, consistent with the best interest and special needs of the child. The health and safety of the child shall be the paramount concern in the development of the case plan. See La. Ch. C. art. 675.
At the disposition hearing, the court shall consider the content or implementation of the case plan and any response filed concerning it. See La. Ch. C. art. 677. The disposition hearing may be conducted immediately after the adjudication and shall be conducted within 30 days after the - adjudication. See La. Ch. C. art. 678. Dispositional alternatives are listed in La. Ch. C. art. 681.
If at any point in CINC proceedings, the child is removed from his parents’ care and control and placed in the custody of the DCFS, the case review process of La. Ch. C. arts. 687-700 is implemented. The custodial agency shall file a case review report with the court or, if appropriate, with the administrative review body ten days prior to every scheduled review hearing. See La. Ch. C. art. 688. A review hearing shall be conducted by the court or administrative review body three months after the disposition hearing if the child was removed prior to disposition or within six months after the disposition hearing if the child was removed at disposition, but in no case more than six months after removál. of the child from his parent(s). Case reviews shall continue to be held at least once every six months thereafter until the child is permanently placed, or earlier upon the motion of a party for good cause shown or on the court’s own motion. La. Ch. C. art. 692.
Regarding permanency hearings, La. Ch. C. art. 702 provides in pertinent part:
. |nB. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court’s own motion.
C. The court shall determine the permanent plan for the child that is most *1128 appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
[[Image here]]
E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child’s placement in an alternative safe and permanent home in accordance with the child’s permanent plan. The child’s health and safety will be the paramount concern in the court’s determination of the permanent plan.
[[Image here]]
G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court will advise the parent of his authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.
More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. State in Int. of S.M., 1998-0922 (La. 10/20/98), 719 So.2d 445; State in Int. of C.S., 49,955 (La.App. 2 Cir. 3/18/15), 163 So.3d 193; State in Int. of P.B., 49,668 (La.App. 2 Cir. 12/17/14), 154 So.3d 806.
In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. See La. Ch. C. art. 702(C)(1); State in Int. of P.B., supra; State in Int. of N.B., 51,374 (La.App. 2 Cir. 2/15/17), 215 So.3d 398.
Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent’s care and custody. Stability in the home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. State in Int. of P.B., supra.
To reverse a trial court’s permanency plan determination, an appellate court must find from the record that the trial court’s finding is clearly wrong or manifestly erroneous. State in Int. of C.S., supra; State in Int. of N.B., supra. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State in Int. of N.C., 50,446 (La.App. 2 Cir. 11/18/15), 184 So.3d 760; State in Int. of P.F., 50,931 (La.App. 2 Cir. 6/22/16), 197 So.3d 745.
*1129 InWhere there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. If the juvenile court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. State in Int. of P.F., supra.
DISCUSSION
KM appeals only from the judgment following the permanency hearing changing the case plan goal from reunification to adoption. She contends it is clearly wrong to terminate the parental rights of a maturing, now 16-year-old in preference to the paternal parents whose son is the perpetrator who impregnated KM when she was 14. KM urges that she initially demonstrated the ability to care for EM by going to doctor appointments, interacting with the child, providing a stable environment, and meeting the child’s daily needs. KM contends that, when she had sufficient family support, she was able to adequately parent EM. According to KM, she later had difficulty getting EM to doctor appointments because she had to depend on her own mother, JC, for transportation. This was not available after JC left the family home. KM argues that she is maturing and will likely be able to care for EM on her own in the coming years. KM maintains that the lower court was manifestly erroneous in changing the case plan goal to adoption. She urges this court to reverse that decision.
The record fails to show that the lower court was manifestly erroneous or clearly wrong in changing the case plan goal from reunification to [^adoption. The DCFS has made reasonable efforts to reunify KM with EM. We recognize that KM faced some obstacles in fulfilling her case plan goals. KM, who is still a minor, was only 14 when she gave birth to EM. KM’s family is unstable and her parents are in the midst of a divorce. Her father may leave the state. KM’s mother is disabled and possibly suffers from drug addiction, preventing her from providing family support for KM. In spite of these factors, KM has failed to fulfill the minimal case plan goals over which she had control, such as remaining in school and regularly visiting EM. While KM stated that she and EM could live with the parents of KM’s current boyfriend, this is a new relationship and there is no showing that this arrangement will be stable or in EM’s best interest.
When KM had extensive family support from her own mother, KM initially showed some indication of perhaps being able to care for EM. However, her efforts and focus on caring for the child quickly waned. EM is a child with significant medical issues, including blindness. She requires a higher level of care than KM has proven able to provide. While KM may develop the ability to care for EM sometime in the future, that ability and commitment is lacking at the present time. EM cannot wait,several years in the hope that KM will mature enough to become the parent that EM requires.
The best interest of EM is of paramount importance. More than one year has passed since EM was taken into DCFS custody. In that time, KM has regressed, rather than progressed, in her efforts to demonstrate that she can adequately care for EM. She has failed to fulfill her case plan goals. While EM has been living with HG and WG, the child has received the necessary nurturing, medical care, and educational support that her special [ isneeds require. The record shows that EM has thrived while in the care of the paternal *1130 grandparents. The paternal grandparents have demonstrated that they are committed to meeting EM’s long-term special needs. Under these circumstances; the lower court did not err in changing the case plan goal from reunification to adoption.
CONCLUSION
For the reasons stated above, we affirm the judgment of the lower court changing the permanent case plan in this matter from reunification to adoption. Costs in this court are assessed to KM.
AFFIRMED.

. Initials are used to ensure the confidentiality of the minors in this case. URCA 5-1, 5-2.

. At that hearing, the court noted that EM was living with the paternal grandparents, was attending a special school, and had therapy twice a week. HG reported that, at a recent visitation, KM brought the child a book, but then would not let her touch it. HG did not think this was appropriate' because EM is blind. She also reported that EM cried when she visited with KM, HG stated that her son, EM’s father, would not live with the family when he is released from prison, She would not agree that KM was the victim of a sex crime because she was promiscuous and did not know who the father of the child .was until paternity testing was conducted. HG said she did not think that the mother of KM’s new boyfriend could provide a stable environment for EM. .