Judgment rendered March 30, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,429-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
N.L. AND S.W.

* * * * *

Appealed from the
Monroe City Court
Parish of Ouachita, Louisiana
Trial Court No. 2019J00111

Honorable Aisha S. Clark, Judge

* * * * *

| | |
|---|---|
| MANNING LAW FIRM<br>By: Bobby R. Manning | Counsel for Appellant,<br>M.W., Father |
| VARHONDA E. BURRELL | Counsel for Appellant,<br>A.L., Mother |
| RAMSEY L. OGG | Counsel for Appellee,<br>State of LA, District Attorney |
| SUSAN E. SKIDMORE | Counsel for Appellee,<br>State of LA, DCFS |
| ELIZABETH C. BROWN | Counsel for Appellees,<br>N.L. and S.W. |

* * * * *

Before STEPHENS, HUNTER, and O'CALLAGHAN (*Pro Tempore*), JJ.

**O'CALLAGHAN (*Pro Tempore*), J.**

The parents of two minor children who entered state custody due to allegations of sexual and physical abuse by the father and neglect by the mother appeal a trial court judgment granting guardianship of the minor children to their aunt. We affirm the trial court judgment placing the children under the guardianship of their aunt as the most appropriate permanent plan for them. However, we remand for the trial court to set specific supervised visitation with the parents, as required by La. Ch. C. art. 723(B).

**FACTS AND PROCDURAL HISTORY**

In June 2019, the mother, A.L., left her young sons, N.L. (DOB 10/19/12) and S.W. (DOB 7/11/14), with their father, M.W., while she was incarcerated. In early August 2019, the Department of Children and Family Services ("DCFS") received a report of sexual and physical abuse of the children. The father was accused of forcing S.W. to perform oral sex on him and pushing the child's head under water, as well as punching and kicking both boys. After these complaints were received, the children were placed with their mother, who had been released from jail, pursuant to a "safety plan." However, the mother failed to uphold her duties under the plan – she tested positive for several drugs, including methamphetamine and cocaine, and, despite being told that the children were not to be left alone with the father, she allowed them to go to the father's home unsupervised, where he hit them again. Bruises on the boys were observed by the DCFS investigator who executed the affidavit supporting the instanter order.

The children were placed in foster care on August 27, 2019, pursuant to an oral instanter order, which was confirmed the following day in a

written instanter order. At the continued custody hearing on August 29, 2019, the parents were present, and, following stipulations of counsel without admissions, the trial court signed a judgment continuing the children in DCFS custody. The children were soon placed with their maternal aunt, a certified foster parent. In September 2019, the State filed a petition to declare the boys children in need of care as a result of neglect due to dependency (mother) and abuse/neglect (father). The parents appeared at the subsequent answer hearing and entered denials. At a December 2019 hearing, the boys were adjudicated children in need of care pursuant to stipulations without admissions by the parents, both of whom were present.

Case plans were approved by the trial court several times.[1] The case plans required each parent to demonstrate emotional stability and freedom from illegal drug use in order to meet the children's needs. The father's plan also included components designed to address his violence/sexual perpetrator issues. The permanency case goal in the first two case plans was reunification with a concurrent goal of adoption. In the case plan submitted in September 2020, the goal was reunification with a concurrent goal of guardianship. In the case plans submitted in November 2020 and March 2021, the goal was guardianship with a concurrent goal of reunification.[2] While the goal was reunification in the February 11, 2020 case review judgment, it was guardianship in the March 4, 2021 case review judgment.

---

[1] The dates of approval were January 21, 2020; June 11, 2020; September 30, 2020; December 8, 2020; and April 5, 2021.

[2] In preparation for various hearings, DCFS submitted reports to the court with updates on the parents' progress on their case plans. These court reports were submitted in August 2020, May 2021, and June 2021. In the August 2020 court report, DCFS recommended changing the case plan goal to adoption. However, the agency changed its recommendation to guardianship prior to the October 20, 2020 permanency hearing, as discussed *infra*.

A review hearing was held on February 11, 2020, at which the trial court was updated on the parents' initial progress. A permanency hearing was held on August 25, 2020. Among other issues, there was discussion about the father's two daughters with his live-in girlfriend being recently placed in foster care. The DCFS court reports indicated that the girls, a newborn and a one-year-old, were removed from their parents' care in early August 2020 because the newborn was drug-affected and failing to thrive. In order to allow more evidence to be obtained, the permanency hearing was recessed until September 18, 2020, at which time several preliminary issues were discussed.

The permanency hearing resumed on October 20, 2020; testimony was given by Mary Lowens, a DCFS caseworker, and Billy Foster, the licensed social worker who conducted the father's sex offender treatment course. Lowens' testimony established that the mother had complied with some basic aspects of her case plan (housing, income, visitation) but not those pertaining to mental health and substance abuse assessments and parenting classes, i.e., the main issues which caused her children to come into foster care. While insurance issues might have played a role in some of those deficiencies, she also had failed to comply with requested monthly drug screens. Lowens testified that the mother visited the children (who loved her) regularly except when precluded by work. As to the father, he was in compliance with the housing, income, mental health, substance abuse, parenting, and visitation aspects of his case plan. While he had also completed court-ordered sexual perpetrator therapy, significant issues remained as to his parenting (including the case involving his infant daughter) and the boys' perceptions of him. S.W., in particular, was afraid

3

of the father. According to Lowens, while the father denied any sexual abuse, he had admitted to physical abuse. Lowens testified that DCFS wanted to change the case plan goal to guardianship based on several factors, including a report by the children's trauma counselor which expressed special concern for S.W's well-being.[3] Foster testified that the father had completed the 12-class course, but he denied any wrongdoing. Foster indicated that was common when dealing with sex offenses.

At the conclusion of the evidence, during a colloquy between the attorneys and the trial judge, the father interrupted the trial judge. The trial judge indicated that the "outburst" the father directed at her was instructive as to whether the father had just "check[ed] the box" by completing parenting classes or actually learned patience or how to handle difficult situations. The trial judge further stated that she was presiding over the case involving the father's daughters and, while the cases were "totally different" with the father being the only commonality, it was "[s]ame similar outburst, every single time." The trial court also expressed disappointment with the mother who, despite her children's love for her, was failing to "stand up" for them and work her case plan. The trial court found that guardianship with a relative was in the best interest of the children, as such an arrangement allowed them to receive proper care while maintaining contact with family members, including the parents. On the day of the hearing, the trial court signed a permanency judgment which granted DCFS's request to change the goal to guardianship but maintained a concurrent goal of reunification. The

---

[3] Other factors included the need to give the children permanency, the maternal aunt's preference for guardianship over adoption, and the fact that guardianship would not involve termination of parental rights.

4

children remained in the care of their maternal aunt, who was willing to be named as their guardian.

In order to give the parents additional time to work their case plans, the trial court did not immediately grant guardianship, and review hearings continued to be held.  However, as shown in the case plan notes and the updates in the DCFS court reports, there were continuing failures by both parents in making progress.  Neither parent fully accepted responsibility for the children being in foster care.  The mother's employment and housing situations fluctuated wildly and she continued to avoid drug screening.  In early 2021, the father was referred to the Family Resource Center ("FRC") for visit coaching, a service designed to help parents determine what their child needs from them at a visit.  As the father's visits with the children increased, there was a notable regression in the boys' behavior, and they began acting out at home and school.  Due to the father's behavior at the visits – which was described as erratic, unpredictable, and authoritative – the FRC refused to continue working with the father on parenting issues.  At a review hearing on May 25, 2021, the visitation situation was discussed in detail, and the trial court indicated it was prepared to implement the guardianship.  Counsel for the father requested that the father be given 30 days to find a new visiting coach.  Stating that it was giving the father the opportunity to address the visitation issues and rehabilitate himself, the trial court granted the request but halted his visits with the children until he found a new visiting coach.  However, it informed the father (the mother was not present) that, if there was no "moving forward," guardianship would be awarded to the maternal aunt.  Accordingly, it ordered that a hearing be held in 30 days, on June 25, 2021.

In preparation for the June 25, 2021 review hearing, a court report was submitted by the DCFS child welfare supervisor on June 24, 2021. It outlined the various issues pertaining to each parent. The father had anger issues, repeatedly demonstrated his inability to listen to authority figures, and failed to understand the impact of his actions on the children. He refused drug screens in April and May 2021 which were requested after he behaved erratically during an April 2021 visit with the children and he was "hostile" and "combative" with a caseworker despite his children being nearby. While the children demonstrated a "great bond" with their mother during visits, she was unstable as to housing and income, failed to obtain mental health or substance abuse assessments, failed to do drug screens, and had questionable compliance as to parenting class attendance.

Due to an emergency involving one of the attorneys, the hearing on June 25, 2021, had to be reset to August 10, 2021. At the permanency and case review hearing held on August 10, 2021, counsel for the father informed the trial court that they had been unsuccessful in finding a new visiting coach. The trial court reminded counsel for the father that it had held the matter open at the father's request in order to give him an opportunity to deal with the visitation matter. The trial court then asked the parties present (the mother was absent) if they wanted a hearing or if they were ready for its ruling. Counsel for the State announced that it stood on the June 24, 2021 report and did not need a hearing. Counsel for the father neither objected on the record nor requested a hearing. Counsel for the mother said she did not have a position. She noted her client's court absences and stated that she did not think the mother had continued her case plan. She then objected "out of an abundance of caution." The trial court

6

acknowledged the objection. It then discussed on the record the long path

the case had followed and the many opportunities given to the parents. The

court granted guardianship in favor of the aunt as the most appropriate

permanent plan for the children. Counsel for the father objected to the trial

court's ruling; the court also noted an objection of the mother's counsel for

the record. The trial court signed a judgment of guardianship and a

permanency judgment on the day of the hearing.[4] Each parent appealed

separately.

## GUARDIANSHIP

### *Law*

The purpose of guardianship is to provide a permanent placement for

children when neither reunification with a parent nor adoption has been

found to be in their best interest; to encourage stability and permanence in

the lives of children who have been adjudicated to be in need of care and

have been removed from the custody of their parent; and to increase the

opportunities for the prompt permanent placement of children, especially

with relatives, without ongoing supervision by the department. La. Ch. C.

art. 718(A). It is intended to ensure that the fundamental needs of children

are met and the constitutional rights of all parties are recognized and

enforced. La. Ch. C. art. 718(B).

The court must determine the permanent plan for the child that is most

appropriate and in the best interest of the child in accordance with certain

priorities of placement, guardianship being below reunification and

adoption. La. Ch. C. art. 702(C). In most permanent plan determinations,

---

[4] We note that the judgment awarded guardianship to the aunt and her husband.

7

the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety is the paramount concern in the court's determination of the permanent plan. La. Ch. C. art. 702(E); *State in Int. of K.P.*, 51,853 (La. App. 2 Cir. 11/15/17), 246 So. 3d 627. More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Int. of D.E.*, 52,305 (La. App. 2 Cir. 8/15/18), 253 So. 3d 877; *State in Int. of K.P.*, *supra*.

After a child has been adjudicated to be in need of care, the department may submit a case plan along with the case review report to the court and all counsel of record recommending guardianship. La. Ch. C. art. 720. According to La. Ch. C. art. 722(A), a mover for guardianship shall have the burden of proving all of the following by clear and convincing evidence:

> (1) The child has been adjudicated to be in need of care.
>
> (2) Neither adoption nor reunification with a parent is in the best interest of the child.
>
> (3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.
>
> (4) The proposed guardian is able to provide a safe, stable, and wholesome home for the child for the duration of minority.

In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch. C. art. 702(C)(1); *State in Int. of*

8

*K.P.*, *supra*. Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody. *State in Int. of E.M.*, 51,511 (La. App. 2 Cir. 6/2/17), 224 So. 3d 1122.

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of D.E.*, *supra*. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *State in Int. of E.M.*, *supra*.

### *Discussion*

On appeal, the parents claim that the trial court erred in changing the case plan goal to guardianship and granting guardianship of the children to the maternal aunt. The father asserts that he complied with his case plan, that he has adequate housing and income to care for the children, and that he made significant measurable progress toward correcting the conditions that led to the children being placed in foster care. The mother alleges that she was not given a proper chance to reunite with her children because the agency was working toward adoption. According to her, all court reports stated that she had a bond with the children, who felt safe with her. She contends that, due to the COVID pandemic, many services could not be completed.

In their joint brief, the State and DCFS dispute the veracity of several statements in the father's brief, particularly his claim to have addressed in counseling being responsible for his actions and identifying his behavior that

contributed to the allegations against him. The State and DCFS assert that, despite the numerous chances given to him by the court, the father failed to address the abuse and trauma the children suffered at his hands, his erratic behavior, and the children's fear of him. He continued to demonstrate physical aggression around the boys during visitation and he never adequately addressed his inappropriate sexual behavior. As to the mother, even though she repeatedly requested and received additional time to work on her case plan, she too failed to follow through and achieve any measurable level of rehabilitation. The attorney for the children made similar arguments in their brief, emphasizing the father's questionable behavior during visitation and the mother's failure to comply substantially with her case plan.

The record before us demonstrates that, at different points after the children were placed in foster care, each parent made some efforts – of varying degrees and longevity – to comply with the case plans established by DCFS. However, they both ultimately failed to make significant measurable progress toward correcting the conditions which caused the children to be removed from their care and custody.

The mother's compliance with her case plan was sporadic at best. Her employment and housing situations swung back and forth repeatedly – between employed and unemployed, from having an acceptable home for the children to homelessness. The amount of effort she expended on obtaining required assessments was questionable. Sadly, the one area in which the mother was consistent was her persistent refusal to submit to drug screening, a crucial element of her case plan designed to monitor the primary reason her young children were removed from her care. As time passed, the

mother's determination to comply with the case plan appeared to wane to the point that she even began to miss court appearances. While the love between her and her children was never in doubt, her ability to control her drug issues and her lack of stability were serious matters of grave concern to the trial court.

After the boys were placed in foster care, the father initially complied with the terms of his case plan. However, the trial court was concerned that his compliance consisted more of "checking the boxes" than actually learning from the classes and programs he was required to attend. Unfortunately, the trial court's apprehensions were validated by the father's actions as time progressed. On more than one occasion, the father disrespectfully interrupted the trial judge in court, demonstrating both a significant lack of impulse control and poor judgment. Instead of allowing his attorney to represent him, he repeatedly insisted on personally addressing the trial judge to "clear up" matters, despite her many admonitions to him that he was "ruining [his] own case" and that he needed to learn to control himself. Even more disquieting was the father's conduct during his supervised visits with his sons, which tended to show that, despite his technical compliance with the case plan, he had not achieved meaningful change as to the circumstances that led to the children being taken into foster care, i.e., his anger and violent tendencies. He frequently made intimidating and coercive statements to the boys. They included blaming S.W. for the family's continuing separation and demanding that the child tell the judge he wanted to live with him. After one family visit was ended, he engaged in an angry verbal altercation with a caseworker, oblivious to the fact that the children were in the next room. Even though random drug screening was a

11

component of his case plan, when his "erratic" behavior during a visit raised serious and valid concerns, he refused to submit to drug screening, which was sought to rule out substance abuse. At best, the father's relationship with his sons continued to be strained, and S.W., who accused his father of sexual abuse, remained afraid of him. Even worse, the boys' interaction with the father affected them to the point of causing regression in their own behavior, which included violence and aggression toward other children. While the father attended the required sex offender course, nothing in the record indicates that he ever acknowledged any responsibility for that aspect of S.W.'s abuse.

Based on the foregoing, we find that the record fully supports the trial court's actions. It repeatedly encouraged and exhorted the parents to make their best efforts for the sake of their children. The trial court gave both parents multiple opportunities to rectify the issues that caused the children to be removed from their care and custody. Lamentably, it was ultimately to no avail. Consequently, we affirm the trial court judgment placing the children under their maternal aunt's guardianship as their permanent placement.

However, La. Ch. C. art. 723(B) requires that the guardianship judgment address the frequency and nature of visitation or contact between the children and their parents as necessary to ensure the health, safety, and best interest of the children. The judgment of guardianship in the instant case merely stated, "Any visits between the parents and minor children shall

12

be supervised by the Guardian."[5]  It was error for the trial court to leave specific terms of visitation to the guardian's discretion.  *State in Int. of K.W.*, 54,304 (La. App. 2 Cir. 1/12/22), 332 So. 3d 825; *State in Int. of D.E.*, *supra*.  Accordingly, we remand this matter to the trial court to set specific supervised visitation periods, if any, and conditions for the parents.[6]

## CONCLUSION

The trial court judgment placing N.L. and S.W. under the guardianship of their maternal aunt is affirmed.  However, the matter is remanded to the trial court to set specific supervised visitation, if any.  Costs are assessed to the appellants, A.L. and M.W.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

---

[5] Also, the permanency judgment signed on August 10, 2021, stated that "[t]he parents shall have the right of supervised visitation in accordance with the attached visitation plan and other court orders."  No such visitation plan was attached.

[6] However, see the 2011 Comment to La. Ch. C. art. 723, which provides:  "The court's authority to limit frequency of visitation includes the authority to forbid contact with the parent altogether.  If there is proof by clear and convincing evidence that parental contact would cause substantial harm to the child, contact can be constitutionally eliminated.  *Troxel v. Granville*, 530 U.S. 57 (2000); *Santosky v. Kramer*, 455 U.S. 745 (1982)."